## WOOD MAXEY v. THE STATE.

### No. 1430. Decided February 14, 1912.

### Rehearing Denied April 10, 1912.

**1.—Murder—Continuance—Confession.**

Where the absent testimony would not have probably produced a different result, there was no error in overruling a motion for continuance; besides, the testimony of the absent witness would not have rendered the confession inadmissible, as the same complied with the provisions of the statute and was voluntarily made; moreover, the stenographic report of the absent testimony was admitted in evidence.

**2.—Same—Voluntary Confession—Evidence.**

Where the written confession showed upon its face that every provision of the statute had been complied with; that it was voluntarily made, and the evidence was such that it was proper for the confession to go before the jury, there was no error; besides, every statement in the confession was proven independently.

**3.—Same—Jury and Jury Law—Challenge—Opinion of Juror—Insanity.**

Where, upon trial of murder, the juryman answered that he recognized insanity but that it would require overwhelming proof, yet on further examination, answered that he would be governed by the court's charge and would try the plea of insanity on the preponderance of evidence, there was no error in overruling the challenge. Distinguishing Jones v. State, 60 Texas Crim. Rep., 139, and other cases.

**4.—Same—Evidence—Matters Drawn Out by Defendant.**

Where the defendant had drawn out parts of the conversation between the witness and deceased, there was no error in permitting the State to bring out the entire conversation. Following Spearman v. State, 34 Texas Crim. Rep., 279; besides, the same facts were proved by other testimony.

**5.—Same—Evidence—Insanity—Opinion of Witness—Bill of Exceptions.**

Where the bill of exceptions with reference to testimony on the defendant's plea of insanity merely contained the question, but not the answer of the witness, the same could not be considered; besides, there was no error in excluding the testimony, in as much as the evidence showed that the defendant was of sound mind at the time of the homicide, and testimony that defendant was subject to epileptic fits did not suggest unsoundness of mind at the time of the killing, as the last spell of epilepsy occurred in the spring prior to the homicide in the October following, and that these spells only affected defendant for a short period of time.

**6.—Same—Insanity—Rule Stated—Epilepsy—Nonexpert.**

One who shows intimate association or a course of dealing with a person will be permitted to testify whether or not in his opinion such person was of unsound mind, but it is only a physician or an expert witness who shows himself qualified that can testify as to what the effect of epilepsy or other disease on the human mind is likely to produce; and a nonexpert witness can not give his opinion on a theoretical question based on facts with which he is not familiar.

**7.—Same—Evidence—Insanity—Self-Serving Declarations.**

Upon trial of murder, where defendant had interposed the plea of insanity, there was no error in refusing to admit in evidence the contract made by defendant with a certain company four years prior to the homicide which provided that if defendant was hurt by reason of having a fit, he would not hold the company liable; as this was in the nature of a self-serving declaration.

**8.—Same—Presiding Judge—Absence from Trial.**

Where, upon trial of murder, defendant and his counsel did not object to the judge stepping aside temporarily to answer a call of nature during the examination of a juror, until after the jury had returned its verdict and no injury was shown, there was no reversible error.

**9.—Same—Manslaughter—Charge of Court.**

Where the matter objected to in the court's charge on manslaughter could only have been beneficial to defendant, and the charge upon the whole was correct, there was no error.

**10.—Same—Charge of Court—Insanity.**

Where, upon trial of murder, the court's charge on insanity followed approved precedent, and did not eliminate any cause that might have occasioned insanity according to the evidence, there was no error.

**11.—Same—Epilepsy—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence under defendant's plea of insanity showed that from childhood defendant had had attacks of epilepsy, but that as he grew older, the attacks were less frequent, and there was no evidence that he had had an attack since the spring before the killing in October, and there was no testimony that would indicate that defendant's mind was otherwise than normal at the time of the homicide, there was no reversible error; the evidence showing a deliberate killing for which the jury assessed the death penalty.

Appeal from the District Court of Grayson. Tried below before the Hon. J. M. Pearson.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*C. Huggins* and *E. W. Neagle* and *J. B. McMillan,* for appellant.—On the question of involuntary confession: Nichols v. State, 23 S. W. Rep., 680; Blocker v. State, 61 Texas Crim. Rep., 413, 135 S. W., Rep., 130.

As to question of opinion of juror: Shannon v. State, 34 Texas Crim. Rep., 5; McWilliams v. State, 32 id., 269.

On question of absence of presiding judge: Bateson v. State, 80 S. W. Rep., 88; Evans v. State, 80 S. W. Rep., 1017.

On the question of insanity and competence of juror: Jones v. State, 60 Texas Crim. Rep., 139, 131 S. W. Rep., 572.

On question of hearsay and conversation of third parties: Potts v. State, 56 Texas Crim. Rep., 39, 118 S. W. Rep., 535.

On question of opinion on insanity: Turner v. State, 61 Texas Crim. Rep., 97, 133 S. W. Rep., 1052; Merritt v. State, 45 S. W. Rep., 21.

On question of confession: Blocker v. State, 61 Texas Crim. Rep., 413, 135 S. W. Rep., 130, and cases above cited.

On question of court's charge on manslaughter: Blocker v. State, 61 Texas Crim. Rep., 413, 135 S. W. Rep., 130; Johnson v. State, 60 Texas Crim. Rep., 50, 138 S. W. Rep., 1021; Barbee v. State, 58 Texas Crim. Rep., 129, 124 S. W. Rep., 961.

On question of the court's charge on insanity: Leggett v. State, 17 S. W. Rep., 159; Freeman v. State, 52 Texas Crim. Rep., 500, 107 S. W. Rep., 1127; Blocker v. State, 61 Texas Crim. Rep., 413, 135 S. W. Rep., 130.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.——Appellant was tried under an indictment charging him with murder, was found guilty, and his punishment assessed at death.

The State introduced a confession of defendant, which reads as follows:

"Sherman, Texas, Oct. 17, 1910.

"This is to witness that my name is Wood Maxey. I am charged with the murder of Earnest Johnson in Grayson County, Texas, on the night of the 16th of October, 1910. I am now under arrest and in the custody of the sheriff of said county charged with said offense. I am warned by Mr. B. F. Gafford (1st) that I do not have to make any statement at all. (2) That any statement made by me may be used in evidence against me on my trial for the offense concerning which the confession is herein made. After being thus warned I voluntarily make the following statement and confession to Mr. B. F. Gafford. I had been to church and was hungry, and I went to Jenkins' restaurant to get some fish. I went in and two persons were at the counter. The clerk was at the back end of the counter and I went back there. He said, 'Here, you want to pull off your hat when you come in here.' I told him that there were two men there at the counter with their hats on. He began cursing and said you will take it off and started up behind the counter and I walked to the front. He came up to me and hit me on the head with a pistol. I told him I was going to have him arrested. I came down to police station. The officer was asleep there. I told him, he said he would see about it. I then went home and then to Will Kerns' house and got the gun. I then went to Frank Patellos and told him I was going hunting this morning and I gave him a half dollar for four shells. I went back home, got my gun, and I then came up here to the restaurant. There were two persons at the counter and Johnson was behind the counter. I then shot him. I shot him because he hit me with the gun."

The State introduced evidence showing that defendant went to church that night, and after returning from church he went to a restaurant where deceased was working to get something to eat, and was told by deceased to take off his hat, when he replied the white men had on their hats and he would not take off his hat, when de-

ceased told appellant to get out of the restaurant, and he refused to do so. Deceased then got a pistol and started toward appellant, when appellant grabbed a catsup bottle and drew it back as if to strike deceased, when deceased hit him on the head with the pistol. Appellant left the restaurant, and went to the police station and reported that deceased had struck him with a pistol, and officer Blalock told him he would have deceased in the court the next morning, when appellant remarked, "You ain't going to do nothing." The officer then started to appellant when he broke and run. Will Kern testifies that appellant came to his house and got a gun, but did not say what he was going to do with it. Frank Patillo testifies that appellant came to his house that night and got four shells, and gave him a half dollar for them, saying he was going hunting. Appellant is then seen going back to the restaurant where deceased was at work, and Walter Jenkins testifies that he was in the restaurant talking to deceased when a gun fired from the outside, and as he looked he saw appellant leaving, and he grabbed a pistol and ran after appellant, shooting at him, but appellant outrun him. Appellant is positively identified by the testimony, other than the confession, as the man who fired the shot which killed deceased instantly, the balls striking him on the left side up and down the neck, face and head. There is no denial in the record of these facts, the defense being that appellant was insane at the time he killed deceased.

1. Appellant filed a motion for a continuance (being his second application) on account of the absence of J. W. Morton, who was in charge of the jail at the time defendant is alleged to have made the confession, and by whom he stated he expected to prove that he was excited and nervous at the time he made the confession, and was at the time in a state of fear, being afraid that he would be mobbed. When the State offered the confession in evidence the defendant objected on the ground that same was not freely and voluntarily made, but was procured through fear and intimidation, and defendant was frightened by reason of the fact that a mob was around the jail. At the instance of defendant the court heard evidence as to the objections urged, and the admissibility of the confession. The defendant then offered, and the court admitted in evidence the stenographer's report of the testimony of the absent witness Morton at a former trial. Not only was the stenographic report of the witness' testimony read in evidence in passing on the admissibility of the fact, but every material fact alleged in the application that it was desired to prove by this witness, and which his testimony shows he would have testified to, was testified to by the sheriff and other witnesses introduced on the trial of the case. The bill further shows that the absent witness was in Oklahoma at the time of the trial. The record being in this condition, we do not think the court erred in refusing to grant a new trial on account of the absence of this witness, as the testimony would not have been such that would probably have produced a different result,

and certainly in the light of the testimony contained in bill of exception No. 9, the testimony of this witness would not have rendered the confession inadmissible. It has been held by this court that the court on appeal will not reverse a judgment on account of the refusal of a postponement' or continuance unless in connection with the other evidence adduced on the trial they are impressed with the conviction not merely that the defendant might probably have been prejudiced in his rights by such ruling, but that it was reasonably probable that if the absent testimony had been before the jury a verdict more favorable to the defendant would have resulted. Land v. State, 34 Texas Crim. Rep., 330; Gallagher v. State, 34 Texas Crim. Rep., 306; Easterwood v. State, 34 Texas Crim. Rep., 400; Sinclair v. State, 34 Texas Crim. Rep., 453; Bluman v. State, 33 Texas Crim. Rep., 43; Goldsmith v. State, 32 Texas Crim. Rep., 112; Hyden v. State, 31 Texas Crim. Rep., 401; Hammond v. State, 28 Texas Crim. App., 413; Frizzell v. State, 30 Texas Crim. App., 42; Pruitt v. State, 30 Texas Crim. App., 156; Ellis v. State, 30 Texas Crim. App., 601; Browning v. State, 26 Texas Crim. App., 432; Boyétt v. State, 26 Texas Crim. App., 689; Covey v. State, 23 Texas Crim. App., 388; Self v. State, 28 Texas Crim. App., 398; Phelps v. State, 15 Texas Crim. App., 45; Logan v. State, 39 Texas Crim. Rep., 573. And where the record showed that the defendant used the testimony given by the witnesses on a former trial of the case, an application for continuance and motion for new trial based thereon will be held to have been properly overruled. Harvey v. State, 35 Texas Crim. Rep., 545. A motion for continuance will also be held to have been properly overruled where substantially the same testimony as that sought from the absent witness was introduced by the defense on the trial. Bluman v. State, 33 Texas Crim. Rep., 43. And we might add in this connection that the court did not err in admitting the confession in evidence. The confession on its face bore evidence that every provision of the statute had been complied with; that it was voluntarily made; and the evidence was such that it was proper for the confession to go before the jury. Every statement in the confession is proven by the State's evidence independent of the confession, and the confession was but corroborative of the State's case as made by its witnesses.

2. In bills of exception Nos. 2, 3 and 4, complaint is made because the court refused to sustain peremptory challenges to three jurors. In the first bill it is shown that juryman Enloe answered that he had read in the newspaper a report of this killing, and therefrom had formed an opinion as to the guilt or innocence of the defendant, but that he would not be influenced by such an opinion, but could and would try the case in accordance with the evidence adduced on the trial, and the charge given by the court. That he did not even remember the name of the party who was killed, but remembered reading of the occurrence. In the case of Adams v. State, 35 Texas Crim. Rep., 285, the identical question raised by appellant is passed on, and

it was held that where the juror answered that he had formed an opinion in the case from reading reports of the killing, rumor and hearsay, but had never heard any of the witnesses state the facts, and had further answered that such an opinion would not influence him in arriving at a verdict, and he could give the appellant a fair and impartial trial, the juror was a competent juror. (See also Suit v. State, 30 Texas Crim. App., 319; Post v. State, 10 Texas Crim. App., 579; Johnson v. State, 21 Texas Crim. App., 368; Kennedy v. State, 19 Texas Crim. App., 618.) The holding of the court in those cases has been adhered to, and in this day and time when the newspapers gather all the news, and nearly every man reads the papers, to hold that reading an account of it in the papers from which he formed some slight opinion, would disqualify all intelligent citizens. If the juryman says he has a fixed opinion, and it might or would influence his verdict, he should be excused, but where his answer indicates it is but an opinion formed from rumor, hearsay, or reading the papers, and the juryman answers that it is not based on hearing the evidence detailed and that such an opinion is so slight it would not influence his verdict, he is not disqualified. By subdivision 13 of article 673 of the Code of Criminal Procedure, it is provided that if it appears a juror has formed an opinion from reading newspaper accounts, communications, statements, or from rumor or hearsay, and if the juror states on oath that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court may, in its discretion, admit him as competent to serve in such case. For additional authorities see section 747, White's Code of Criminal Procedure. In the other bills the jurymen answered they had no opinion as to the guilt or innocence of the defendant, and other preliminary questions satisfactorily; but on cross-examination the following occurred:

"Q. Do you recognize that condition of mind known as insanity? A. Yes, sir. Q. Do you believe it right to punish a person for an act committed while he is insane? A. No, sir. Q. Suppose in this case the State should show conclusively that defendant killed deceased without legal justification or provocation and defendant should plead insanity, and the court should charge you that if defendant proved by a preponderance of the testimony that he was insane when he committed the act, to acquit him, and suppose defendant should show by a preponderance of the testimony that at the time he committed the act he was insane, suppose those things should occur, what would be your verdict? A. I don't hardly catch that. Q. Suppose the court should charge you as I have indicated and the plea should be as I have indicated, then would you require the defendant to prove beyond a reasonable doubt he was insane in order to acquit him? A. Yes, sir. Q. In other words, the way you feel you would require him to prove beyond a reasonable doubt or prove by overwhelming testimony he was insane before you are willing to acquit, is that the idea? A. Yes, sir.

Here the defendant challenged the juror for cause.

Examined again by the State the juror testified further as follows: Q. If chosen as a juror you are willing to accept the law as given by the charge of the court and be governed by it? A. Yes, sir. Q. In a criminal case the State is required to establish the guilt of the defendant by evidence beyond a reasonable doubt, but where the defendant interposes as a defense the plea of insanity he is required to prove his insanity, but not required to prove it beyond a reasonable doubt, he is only required to prove it by what is called the preponderance of the testimony, which means the greater weight and degree of credible testimony. Would you require him to do any more than that before giving him a benefit of a doubt—would you require him to go by law or be governed by law? A. I would be governed by the court's charge and the evidence. Q. If you thought under the court's charge, he was entitled to be acquitted if he proved by a preponderance of the testimony he was insane and in the plea he would prove by the preponderance of the testimony he was insane, then you would acquit? A. Yes, sir.

Examined again by the defendant the juror testified further as follows:

Q. If I understood you a while ago, in order to acquit defendant on the ground of insanity, he would have to show you by overwhelming testimony he was insane at the time he committed the act—prove beyond a reasonable doubt he was insane, that is what you mean? A. Yes, sir. Here defendant challenged the juror for cause. Examined again by the State the juror testified further as follows: Q. If the law don't require him to prove beyond a reasonable doubt would you require him to do it? A. No, sir, not if required by law. Q. He is not required to establish the fact of insanity beyond a doubt, but is required to prove it by a preponderance of the testimony—my question is, would you require him to prove his defense of insanity beyond a reasonable doubt, or would you give him the benefit of it if he proved all the law required? A. I would give him the benefit of all. Q. If he proved all the law requires? A. Yes, sir. Mr. Freeman: We submit the challenge. Thereupon the court overruled defendant's challenge and defendant excepts."

We have copied one bill in full, and the other is similar. It will be seen that the juryman answered he recognized the defense of insanity, and would not punish a man for an offense while in that condition, but in answer to leading questions, if he would require a defendant to prove that defense beyond a reasonable doubt, and if it would require overwhelming proof, he answered, yes, sir, but upon the matter being explained to him on further examination he answered that he would be governed by the court's charge, and that if the law did not require him to prove that defense beyond a reasonable doubt, he would not require it, and would give him the benefit of his plea if proven by a preponderance of the evidence. Appellant cites us to the case of Jones v. State, 60 Texas Crim. Rep., 139, 131 S. W. Rep., 572, but that case

does not support his contention. After having the matter explained to
him the juryman in that case answered, "It (the evidence) would cer-
tainly have to be overwhelming." In this case, after the matter is
explained, the juryman answers the very reverse to what the juryman
answered in the Jones case, and says he would give him the benefit of
this defense if proven by a preponderance of the evidence, and would
not require him to prove his defense beyond a reasonable doubt. Un-
der the holding in the Jones case the juryman in this case would be
qualified, and the court did not err in so holding. See also Tubb v.
State, 56 Texas Crim. Rep., 606, 117 S. W. Rep., 858, and the au-
thorities there cited.

3. Appellant objected to the witness Walter Jenkins being per-
mitted to state on redirect examination a conversation had with de-
ceased prior to the time he was shot, in which deceased gave in detail
the prior trouble with defendant when he (deceased) had struck de-
fendant with a pistol. The court overruled the objection on the ground
that defendant, on cross-examination, had elicited parts of the con-
versation, and had gone into the matter. If the defendant on cross-
examination had brought out the fact that deceased had told witness
that defendant and himself had a prior altercation, and deceased had
struck defendant with a pistol, the remainder of the conversation re-
lating to the same matter could be brought out by the State on redirect
examination. Article 791 of the Code of Criminal Procedure provides:
"When part of an act, declaration or conversation or writing is given
in evidence by one party, the whole on the same subject may be in-
quired into by the other." And in Spearman v. State, 34 Texas Crim.
Rep., 279, it is held where the defendant has drawn out parts of
the conversation he had with a witness, it is permissible for the State
to prove all that occurred, being parts of the same act and conversa-
tion. The defendant on cross-examination brought out the fact that
deceased had told him about having had trouble with appellant, and
had shown him the pistol with which he struck appellant, and other
matters connected with the first difficulty. Under such circumstances
it was permissible for the court on redirect examination to permit the
witness to tell all that was said about the difficulty at that time. (For
authorities see sec. 1043, White's Code of Criminal Procedure.) In
addition to this, the admission of this evidence could not have been
hurtful to defendant, for the witness Carter, who was present and saw
the difficulty, testified to the same facts in effect.

4. While the witness, R. A. Chapman, was on the witness stand
defendant asked him, "Have you ever at any time noticed anything
peculiar or observed anything peculiar about Wood Maxey's speech or
conduct or appearance to indicate to you that he was insane or of
unsound mind?" To which question the State objected, and the court
sustained the objection, but permitted appellant to make the following
proof by the witness:

"Q. State to the jury anything that you ever noticed about Wood Maxey's appearance, speech or conduct? A. Well, after he would have a fit I have seen him sit on the steps and laugh like a fool and no sense in him at all. I have seen him after these fits and he would not have sense enough to go home and I would have to ask the fellows at work in the mill to send him home. I sent him home by them several times. He didn't have sense enough to go home and I would sometimes get him to go home and he wouldn't know where he lived. Q. State whether or not you could tell any difference in his expression? A. Oh, yes, you could tell it very readily after he had a fit. Q. How could you tell it? A. His general appearance, his eyes looked glassy, didn't look very rational at times. Q. Did you ever talk to him at those times? A. Yes, sir. Q. Would he answer you? A. Yes, but his speech would be slow and he wouldn't seem to gather what you would say to him." The witness was also permitted to testify that he had seen appellant have a number of epileptic fits; that defendant had had one fit in the spring preceding the killing in October, and that he had Dr. Jones give him medicine for these spells.

5. In another bill appellant complains Judge G. P. Webb was on the stand and had testified that appellant had come to his office while he was county judge, and that he had come there at intervals extending over something like eight months, and appellant asked him the following question: "Did you, at any time, notice anything peculiar about his appearance, his speech or conduct that led you to conclude he was of unsound mind?" which question was objected to by the State on the ground that no sufficient predicate had been laid, was leading, etc., which objection was by the court sustained, to which action of the court defendant excepted, when the following proceedings were had:

"Q. Did you ever notice at any time any peculiarity about his expression and his appearance? A. Yes. Q. What was it? A. On several occasions, two or three at least, he came to see me when he had his lips swollen and lacerated, and my recollection is that he had a wound on either his face or his hand, possibly both, on those occasions he had a dull, listless expression out of his eyes, and didn't appear at all as he did at other times when I saw him. Q. In your judgment at that time would his mind seem to be affected or as good as usual? The State objected to this as immaterial and irrelevant, as to whether or not his mind was as good as usual. Huggins: The question is, if at those times his mind seemed to be affected or as good as usual. The court overruled the objection. Q. What is your judgment about that? A. I didn't think he was the same mentally at those times as he was at other times, that was my opinion. Q. What was the difference? A. At other times when I saw him, he was bright and intelligent in appearance and seemed to be almost gentle; these times that I speak of he seemed to be absent minded, unresponsive, gloomy and almost brutal in appearance."

These two bills sufficiently present the question raised in the record.

In one it will be noticed that Judge Webb saw the defendant occasionally covering a period of about eight months some time prior to the homicide, and was asked if at times he saw anything peculiar that led him to believe defendant was of unsound mind, while the witness Chapman was asked if he at any time ever saw anything peculiar that led him to believe defendant was of unsound mind. The defendant in these bills merely shows he asked the question and does not state what the answer of the witness would have been, but concede that the witnesses would have answered that they at times had noticed things peculiar that led them to believe defendant was at that time of unsound mind, as shown by the testimony of Judge Webb and others, this was at peculiar times only; in fact, only at such times as when defendant had just had an epileptic fit or spasm, and that all other times he was in possession of all his faculties, and was sane and knew right from wrong. If defendant had offered to prove by any witness that appellant at or about the time he shot deceased he had just had an epileptic fit, or was just recovering from one, this evidence might have been admissible. But the record in this case shows that appellant went to church that night clothed in his right mind; those who walked home with him noticed nothing peculiar; he appeared at the restaurant and was rational; at the police station, at the place where he got the gun, and at the place where he got the cartridges, no one noticed anything wrong. When he was arrested, nothing wrong appeared, and in the jail, from the testimony, there was nothing to suggest unsoundness of mind. In the record, the last spell of epilepsy he is shown to have suffered from was in the spring prior to the homicide in October, and none of the witnesses testify that these spells affected him mentally longer than a short period after he had suffered from a fit. Under the record in this case, there was no error in the ruling of the court in these matters as shown by the bills. In the case of Jordan v. State, recently decided by this court, it was held that one who shows intimate association or a course of dealing with a person, he will be permitted to testify whether or not in his opinion a person was of unsound mind, but it is only a physician or an expert witness who shows himself qualified, can testify as to what the effect of epilepsy or other disease on the human mind is likely to produce. A nonprofessional witness who brings himself in such contact with an individual, and by his dealings or otherwise, shows a knowledge of the acts and conduct of such individual, can testify as to his opinion of the sanity of an individual, but he can not give an opinion of a theoretical question based on facts with which he is not familiar, or give an opinion as to what would be the result of a given course of conduct or disease as producing insanity.

6. Neither was there any error in the court excluding a contract entered into by defendant four years prior to the homicide. The contract would in no way aid the jury in determining whether defendant was sane or insane at the time he killed deceased. The contract merely states that defendant being subject to fits, if he was hurt by reason of

having a fit, he would not hold the company liable. This would be but a self-serving declaration that he was subject to fits, and this is not disputed in the record, that he in times past had had epileptic fits. While a great deal of testimony in the record is introduced to show that appellant was subject to epilepsy, and that at the time he had a fit, and shortly thereafter, he was unconscious and his mental faculties were affected, yet there is no testimony that these spells had permanently affected his reason. On the other hand, the record would indicate that after recovering from the effects of the spasm, he was intelligent, capable of knowing right from wrong, and engaged in the manual occupations men usually engage in, and of mental capacity sufficient to enable him to perform the duties incident to his work. He managed his own affairs, did his own trading, collecting the money due, and transacting all the routine affairs of life.

7. In his motion for new trial, in the third ground, appellant complains that the "court erred in that the presiding judge left the courtroom while the trial was in progress, and in permitting important proceedings to take place in his absence, as shown by exhibits A and B attached to the motion for new trial." Exhibits A and B and two affidavits, in which it is alleged that while juryman Vaughn was being examined the presiding judge left the courtroom, appear in the record. In hearing the motion evidence was adduced and Hon. J. M. Pearson, the presiding judge, testified: "I was not aware until this morning, when the motion was read, or just before it was read, that there was any such objections. I recollect leaving the courtroom and as I got up they had called a juror for the purpose of examination. I remarked as I got up, I said 'suspend a minute.' I went to the water closet or urinal and was not gone two minutes and came back, and when I came back the juror was on the stand and both parties announced they would receive him and he was sworn in in the presence of the court. I do not know whether one of the gentlemen heard me make the remark, but I made the remark to 'suspend a minute.'" The urinal is shown to be in the courthouse, about fifteen steps from the door of the District Court room. The attorneys for appellant say they did not hear the judge say "suspend a minute," and that the examination of the juror was proceeded with. They admit they knew he was absent at the time, and did not object at the time to proceeding with questioning the juror, and when the juror was sworn did not except to the action of the court, and made no objection until after the jury had returned its verdict. No injury is attempted to be shown, and while a judge should never absent himself from the courtroom during the trial of a case, yet when a call of nature requires him to retire for a few minutes, and he instructs attorneys to suspend, and with a knowledge of his absence they proceed, and do not call the attention of the court to the action which occurred in his absence, reserve no bill of exception, in the absence of injury shown this will not be cause for reversal, when first called attention to in the motion for new trial.

If appellant's attorneys had called the attention of the judge to the fact that the State's attorney had asked this juryman questions during his absence, and challenged him for that reason, doubtless the court would have sustained their challenge. But with a knowledge of these facts, they accept the juryman, and it is too late to complain after verdict is returned, unless they can show that their client has suffered some injury. In this case, there being no attempt to show injury, or that the juryman was not competent in every sense of the word, and was not an impartial juror, it presents no error.

8. The court in his charge submitted murder in the first and second degree, manslaughter, and the defense of insanity. There is no complaint of the charge on murder in the first and second degree, but appellant criticises the following paragraph of the charge on manslaughter: "The past conduct of the deceased to defendant, his threats and bearing—in fact, all the facts and circumstances in the case should be considered by the jury. An act standing alone may not be sufficient provocation, but may be ample when one is a series of similar acts, or when it has been preceded by an aggravating course of conduct, whether similar or not to the act committed at the time of the homicide." Appellant claimed that there was no evidence in the record on which to base the charge. By the testimony of the witness Jenkins and Carter it is shown that about half an hour prior to the time that defendant shot deceased, deceased had ordered him out of the restaurant, words had ensued, and deceased had struck appellant with a pistol on the head, when appellant left, got a gun and shells, and returned and shot deceased. In telling the jury that they could take this conduct into consideration in considering the condition of appellant's mind at the time of the shooting, if error, was not such error as appellant can complain, because it could only be beneficial to him. When we take the charge on manslaughter as a whole it is a fair presentation of the issues as applicable to the evidence in this case.

9. The only other criticism of the charge relates to the issue of insanity. After defining insanity, as approved by this court in a number of decisions, the court instructs the jury:

"Therefore, if you believe from the evidence beyond a reasonable doubt that the defendant did kill Ernest Johnson by shooting him with a gun as charged in the indictment; but if you further believe from a preponderance of the evidence that at the very time he committed the act the defendant's mind was in an impaired and unsound state to such a degree that for the time being it overwhelmed the reason, conscience and judgment and that the defendant in killing said Johnson acted from an uncontrollable and irresistable impulse produced by such impaired and unsound condition of his mind that deprived him of a knowledge of the right and wrong as to the killing, you will find him not guilty."

The criticism of appellant is that in this paragraph the court eliminated one of the causes relied on by defendant to produce insanity,

being struck over the head with a pistol just prior to the homicide. In this paragraph the court did not eliminate any "cause" that might have occasioned insanity, and in no part of the charge does he do so, but submits the case properly to them under the entire evidence in the case.

We have carefully reviewed the record and every ground assigned as error. The record shows that from childhood appellant had had attacks of epilepsy, but it is also disclosed that as he grew older the attacks were less frequent, and there is no testimony that he had an attack since the spring before this killing occurred in October. No one who came in contact with appellant on the night of the homicide either before, at the time of or subsequent to the homicide, testify to any fact that would render him not responsible for his act. No one testifies to any act or conduct for sometime prior to the homicide that would indicate his mind was otherwise than in a normal condition, and when not suffering from an attack of epilepsy, he is shown to have been possessed of as much intelligence as the average of his race. It may be said that in some cases epilepsy weakens the mental faculties and leads to insanity, but in this case the evidence does not disclose that impairment of the intellect which would prevent appellant from being held responsible for any offense he might commit. The penalty assessed by the jury is a severe one—the most severe known to the law—yet he has had a fair and impartial trial, and when it is known that he leaves the restaurant, goes a quarter to half a mile, borrows a gun, goes to another and buys cartridges, and then returns, and standing on the outside, takes deliberate aim and kills his fellow man, we can not say that the verdict is improper.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied April 10, 1912.—Reporter.]