EX PARTE HARRY McCORMICK, E. M. POOLEY, GEORGE COTTINGHAM, ED RIDER, MAX JACOBS, AND FRANK L. WHITE.

Nos. 17958, 17959.   Delivered November 6, 1935.
Rehearing Denied December 4, 1935.

*Frank A. Liddell* and *Huggins, Kayser & Liddell,* all of Houston, for George Cottingham, Ed Rider, Max Jacobs, and Frank L. White.

*Fullbright, Crooker & Freeman,* of Houston *(John H. Crooker* and *Leon Jaworski,* both of Houston, of counsel) for Harry McCormick and E. M. Pooley.

*Wm. H. Wilson,* of Houston, *Lloyd W. Davidson,* State's Atty., of Austin, and *R. A. Bassett,* Dist. Atty., of Richmond, for the State.

*A. R. Rucks, W. D. Evans, J. P. Bryan,* and *Carlos B. Masterson,* all of Angelton, *Turner, Rodgers & Winn,* of Dallas, *A. Harris, W. E. Davant, E. J. Wilson, C. A. Erickson,* and *S. J. Styles,* all of Bay City, *A. R. Stout,* of Houston, *M. S. Munson,* of Angelton, *Greenwood, Moody & Robertson,* of Austin, and *F. H. Crain, J. V. Vandenberge, Jr.,* and *J. G. Stofer,* all of Victoria, amici curiae.

CHRISTIAN, JUDGE.—These are original habeas corpus proceedings. Ex parte Harry McCormick and E. M. Pooley, No. 17,958, and Ex parte George Cottingham, Ed. Rider, Max Jacobs and Frank L. White, No. 17,959, have been consolidated by an order of this court, and will be considered together.

On July 23, 1935, there was in progress in the District Court of Brazoria County, Texas, the trial of Clyde Thompson on an indictment charging him with the murder of Everett Melvin. Ed. Ebers and Raymond Hall were each charged by separate indictments pending in said court with the same murder. After the jury had been selected for the trial of Thompson, the Honorable M. S. Munson, judge before whom the case was on trial, instructed relators McCormick, Rider and White, all of whom were newspaper reporters, not to publish the testimony in the Thompson case until after the trial of the companion cases of Ebers and Hall, both of which were set for trial at later dates during the term. The reasons assigned for such instruction were that the evidence adduced at Thompson's trial

might have a tendency to disqualify prospective jurors in the companion cases; that such publication might necessitate a change of venue in said cases; and that the publication of the testimony would have a tendency to prejudice the jurors against Hall and Ebers. The reporters communicated the court's instruction to their respective newspapers. Relator Cottingham, who was editor of the Houston Chronicle, relator Jacobs, managing editor of the Houston Post, and relator Pooley, managing editor of the Houston Press, each refused to refrain from publishing said testimony. On July 26, 1935, the court prepared and signed a written order directing relators to refrain from publishing said testimony. Relators declined to obey the court's instruction, and published in their respective newspapers a true and impartial statement of the evidence adduced during the trial of Thompson. After being duly cited and given a hearing, relators were adjudged to be guilty of contempt of court and assessed fines.

It appears to us that respondent unduly stresses the tendency of accurate newspaper reports of public trials to embarrass the administration of justice. Under our statute opinions formed from reading newspaper accounts may not disqualify a juror from sitting in a particular case. In Parker v. State, 238 S. W., 943, this court upheld the action of the trial court in denying a change of venue, and in the course of the opinion said: "We gather that the evidence of prejudice, upon which the appellant relies, is traceable to the alleged consequences of newspaper publications. Those set out in the document to which we have referred appear to be such only as might come within the scope of the proper functions of a newspaper, in informing the public of current events. Such publications alone have not, within our knowledge, been held adequate to support the inference of prejudice necessary to secure a change of venue. Cox v. State, supra; Ruling Case Law, vol. 27, p. 818, sec. 36. Our statute upon the selection of individual jurors recognizes that even opinions formed from reading newspaper accounts may not disqualify the juror from sitting in a particular case. Code of Crim. Proc., art. 692, subd. 13; Grissom v. State, 4 Texas App., 374; Rothschild v. State, 7 Texas App., 519; McKinney v. State, 31 Texas Crim. Rep., 583, 21 S. W., 683; Ashton v. State, 31 Texas Crim. Rep., 479, 21 S. W., 47; Groszehmigem v. State, 57 Texas Crim. Rep., 241, 121 S. W., 1113; Maxey v. State, 66 Texas Crim. Rep., 234, 145 S. W., 952; Myers v. State, 71 Texas Crim. Rep., 594, 160 S. W., 679; Myers v. State, 77 Texas Crim. Rep., 239, 177 S. W., 1167. It

is not to be expected that the men of intelligence from whom our juries are drawn and whose judgment is potent in forming public opinion will not inform themselves of the events of the day as they are reflected in the press, nor that they will generally form from such reports an opinion so fixed as to render them incapable of forming an impartial judgment from hearing the evidence revealed by the witnesses, under oath, in a given case." Again, in Willis v. State, 81 S. W. (2d) 693, the court said: "That newspapers have a right to publish news is beyond question, and citizens who have merely read reasonably accurate descriptions of crimes in newspapers are not ipso facto to be barred from jury service upon juries before whom are tried cases involving such facts. The controlling issue in the selection of jurors who may have heard or read what purports to be the facts of any given case is the resultant effect upon the mind of the proposed juror. Not all men have beliefs or form definite or fixed conclusions as to cases, men, or issues merely from newspaper reading; and the ascertainment of the attitude of veniremen called to try a case is first by finding from them, when brought before the court, what they have read or heard, and what they think to be their ability to fairly try the issues uninfluenced by what may have crossed their path. What they say, in connection with other facts brought to the attention of the court, will first be passed upon by the trial judge, whose judgment will be subject to review upon appeal, and will be upheld unless, in the opinion of the appellate court, same is so manifestly incorrect as to reflect an abuse of discretion to the probable injury of the accused.

The law throws adequate safeguards around the accused. The trial judge is empowered to order a change of venue on his own motion. The accused may have a change of venue upon making the showing required by the statute. Great latitude is accorded for determining upon voir dire examination whether jurors entertain such opinions touching the merits of the case as will influence their action in finding a verdict. On motion for a new trial upon a showing that a prejudiced juror was impaneled without fault on the part of the accused a new trial will be awarded, or else upon appeal to this court the judgment of conviction will be reversed. The danger that an accused will suffer conviction at the hands of a prejudiced jury would appear to be too remote to warrant the trial court in concluding that an accurate and impartial publication of the proceedings of a public trial would tend to prejudice the rights of others to be later tried. But if it be conceded that a speedy trial by an

impartial jury in the county where the indictment had been returned would not likely be had as the result of the publicity given to the proceedings in another case, it would not follow that the exercise of the constitutional privilege of liberty of speech and of the press should be abridged.

The eighth section of the Bill of Rights reads, in part, as follows: "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press."

The language of this provision makes plain its purpose to prevent previous restraints upon publication. The privilege of writing one's views is accorded and protected, and at the same time accountability to the law is demanded for the abuse of the privilege. See Ex parte Tucker, 220 S. W., 75. This guaranty is also embodied in the constitutions of the several American States and in the first amendment to the Constitution of the United States. Its establishment in the American Bill of Rights was the outgrowth of the struggle of a liberty loving people for freedom from the repressive measures resorted to in England and in the American Colonies for the purpose of restraining the free expression of speech. It has been said that the privilege which is thus protected in the organic law of the land "is almost universally regarded, not only as highly important, but as being essential to the very existence and perpetuity of free government." Cooley's Constitutional Limitations, Eighth Edition, page 876.

It is generally conceded that liberty of the press means immunity from previous restraints or censorships. Touching this conception of the immunity extended by the first amendment to the Federal Constitution, it is said in Near v. Minnesota, 283 U. S., 697: "In determining the extent of the constitutional protection, it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication. The struggle in England, directed against the legislative power of the licensor, resulted in renunciation of the censorship of the press." The right of the individual to publish his views on any subject cannot co-exist with the power to prevent him from doing so. As said in Ex parte Tucker, supra: "There can be no liberty in the individual to speak, without the unhindered right to speak. It cannot co-exist with a power to compel his silence or fashion the form of his speech. Responsibility for the abuse of the right, in its nature pre-supposes freedom in the exercise of the

right. It is a denial of the authority, anywhere, to prevent its exercise."

In Ex parte Foster, 44 Texas Crim. Rep., 423, 71 S. W., 593, this court expressly held that the trial court was without power to prohibit the publication of the testimony adduced during the trial of a criminal case. We entertain no doubt as to the correctness of such holding. It is in harmony with the general conception, as illustrated in the judicial precedents, that liberty of the press means immunity from previous restraint or censorship. It gives effect to the purpose for which the constitutional guaranty was designed, as made evident by its language and historical antecedents. We quote from the opinion as follows: "Section 8 of our Bill of Rights guarantees the freedom of speech and the liberty of the press. Section 10 guarantees to an accused person a speedy public trial by an impartial jury. If the constitution guarantees a public trial, is it in the power of the court to make it a private trial? If not, then where is the power of the court to prohibit spectators, or to require or enforce thereafter silence on those who may witness and hear the proceedings? If there is no power on the part of the court to prevent spectators from rehearsing evidence, by the same logic the court has no authority to prevent a publication of the testimony. Our constitution is but in accord with the genius and spirit of our free institutions, which is intended to guarantee publicity to the proceedings of our courts, and the greatest freedom in the discussion of the doings of such tribunals, consistent with truth and decency. And as has been well said, 'When it is claimed that this right has in any manner been abridged, such claim must find its support, if any there be, in some limitation expressly imposed by the lawmaking power.' And this imposition must be in accord with the provisions of our constitution guaranteeing the publicity of all trials, as well as the freedom of speech and of the press. We take it that the learned judge who exercised his authority in this instance did it, as he believed, in the interest of the due administration of the law; but the argument of convenience can have no weight as against those safeguards of the constitution which were intended by our fathers for the preservation of the rights and liberties of the citizen. And even if there was a conflict here between the authority and dignity of the court, that should yield to the plain letter of the constitution. We accordingly hold that the court had no power to prohibit the publication of the testimony of the witnesses in the case, and that his act in pun-

ishing the relator for contempt for violating that order was without jurisdiction, and was consequently void."

We are of the further opinion that, under the holding in Foster's Case, it cannot be said that realtors abused their constitutional privilege. It is conceded that they published a true and impartial statement of the testimony adduced during the trial of Thompson, the proceedings of which were public pursuant to the command of the tenth section of the Bill of Rights. In the nature of things, the proceedings of public trials constitute news which newspapers have the right to publish in informing the public of current events.

The relators are ordered discharged.

*Relators ordered discharged.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON RESPONDENTS' MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—The respondents contend in their motion for rehearing, as understood, that inasmuch as the learned trial judge entertained the opinion that the publication of the testimony given upon the trial was reasonably calculated to impede or interfere with the due administration of justice, the relators were culpable. The good faith of the trial judge in entering the order is conceded, but his authority to punish the relators for refusing to abide his order is denied.

The decision in the present appeal advances no new principle or practice. The conclusion of this court, as expressed in the original opinion, is founded upon the Bill of Rights in which there is guaranteed the freedom of speech and liberty of the press. A speedy public trial by an impartial jury is guaranteed to persons accused of crime. The conclusion of this court is further supported by precedents, notably, the decision in Ex parte Foster, 44 Texas Crim. Rep., 423, to which reference is made in the original opinion. Emphasis, if needed, is found in other decisions of this court upon a like subject to that involved in the present appeal. Among such cases is Willis v. State, 81 S. W. (2d) 693.

The statute, Art. 560, C. C. P., vests the trial judge with power and wide discretion in the matter of change of venue. Formerly, if a proposed juror stated that he had formed an opinion from any source, his disqualification followed as a matter of law.

"Now, by express statute, an opinion so based is not a disqualification if the juror is willing, and believes himself able, to put aside any preconception of the case, and if the court sees no reason to doubt this."   (Tex. Jur., Vol. 26, p. 767, sec. 203).

See Willis v. State, supra, and also Parker v. State, 238 S. W., 943, in which case each of the judges of the Court of Criminal Appeals, in separate opinions, concurred in the above statement.

A further discussion of the motion for rehearing is pretermitted with the statement that the conclusion reached and stated in the original opinion has the concurrence and sanction of the members of the Court of Criminal Appeals.

The motion is overruled.

*Overruled.*