**In re HEARST NEWSPAPERS PARTNERSHIP, L.P. and Galveston County Daily News, Relators.**

**No. 01–07–00866–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 30, 2007.

Charles A. Daughtry, Daughtry & Jordan, P.C., Thomas M. Gregor, William W. Ogden, Ogden, Gibson, White & Broocks, Houston, TX, Jonathan R. Donnellan, The Hearst Corp., New York, NY, for Relator.

James D. Ebanks, Ebanks, Smith & Carlson, L.L.P., Otway Denny, Jr., Katherine D. MacKillop, Fulbright & Jaworski L.L.P., Don R. Riddle, Riddle, Arturo Gonzales, Brent Coon & Associates, Kenneth Tekell, Tekell, Book, Matthews & Limmer, Houston, TX, Brent W. Coon, Beaumont, TX, James B. Galbraith, Galveston, TX, for Real Party in Interest.

Panel consists of Chief Justice RADACK and Justices ALCALA and HIGLEY.

## OPINION

ELSA ALCALA, Justice.

By petition for writ of mandamus, relators, Hearst Newspapers Partnership, L.P.

("Hearst News") and Galveston County Daily News, challenge the trial court's[1] order prohibiting discharged jurors from speaking to the press, media, or others about the evidence and what their votes would have been after the trial ended in a settlement. The relators contend the order is an unconstitutional prior restraint on their right to gather news under both the Texas Constitution and the First Amendment. We conditionally **grant** the petition for writ of mandamus.

## Background

After an explosion at BP's Texas City plant in March 2005, about 4,000 individuals filed cases against BP and others.[2] The explosion and the cases received much publicity on the local and national levels. Among other things, this publicity included news reports, television interviews, mailings sent to local residents, town hall meetings with BP employees, and Chamber of Commerce meetings.

In August 2007, a group of plaintiffs was called to trial. Due to the pretrial publicity, the trial court called over 1200 people to report to jury duty to ensure that a jury and several alternates could be empaneled. This jury heard ten days' evidence from the plaintiffs before the trial court announced that the parties had reached a settlement. After the trial ended, the trial court permitted the lawyers for each side to meet with the jurors, who had some positive things to tell each side's lawyers. However, with approximately 1200 cases still pending, the trial court was concerned about additional pretrial publicity interfering with the parties' rights to a fair trial by making the task of selecting future

juries even more difficult, particularly because the jurors had not heard all the evidence. Therefore, the trial court admonished the jurors, "I am going to forbid you from speaking to anybody in the media or anybody other than myself or the lawyers or their employees until after all cases have settled."

Two days later, Hearst News, on behalf of the *Houston Chronicle,* intervened, requesting the trial court to reconsider and rescind the gag order on the jurors. Soon thereafter, the Galveston County Daily News also intervened. Hearst News argued that the order was an unconstitutional prior restraint under both article I, section 8 of the Texas Constitution and the First Amendment. The trial court promptly held a hearing, affording all parties and the newspapers an opportunity to be heard. No evidence was adduced at this hearing. However, the trial court described the unusual nature of the litigation, including the large number of parties and the extensive pretrial publicity.

> In addition to the newspaper media, we have had to deal with the web site issue, the internet issue, mailing things to jurors, word on the street, talks being given at Chamber of Commerce. We have had hours and hours of hearings about how much is out there ... [We] have talked to hundreds and hundreds and hundreds of jurors in these past two voir dire panels to try to find out how many people were affected by the publicity. The first time we called in a panel we called in I think 12 or 13 hundred to get the 12, and the second time we realized that....

---

**1.** Respondent is the Honorable Susan E. Criss of the 212th District Court of Galveston County, Texas. The underlying suit is *In re: Texas City Explosion, March 23, 2005, Coordinated Discovery Proceedings,* Cause No. 05–CV–0337–A, (212th Dist. Ct., Galveston County, Tex.).

**2.** "BP" refers to BP Products North America, Inc.

It costs a tremendous amount of money to the taxpayer to bring in the kind of panel you have to get down to just twelve impartial people in this case.

The trial court declined to rescind the gag order, but instead signed a written order limiting the time period of the restriction on the jurors' speech.

In the order, the trial court found that (1) no final judgment or nonsuit was reached in the subject trial and that numerous other claims in the consolidated litigation remained outstanding; (2) media coverage of the discharged jurors' impressions about the evidence, trial, or disclosure of what their votes would have been, based upon the incomplete trial record, posed a threat to the administration of justice in the remaining, pending cases; and (3) the temporary restriction on discharged jurors' speech was the least restrictive. means available to prevent the potential harm. The trial court, therefore, ordered that "discharged jurors are under an instruction not to speak or disclose to the press, media, or others about their views of the evidence and/or their impressions of what their vote would have been if the evidence had concluded on the day that the jurors were discharged until on or after January 2, 2008 unless such order is extended upon motion of any party for good cause shown."

### Standard of Review

■■■ Mandamus relief is available only to correct a "clear abuse of discretion" when there is no adequate remedy by appeal. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding). "A trial

court clearly abuses its discretion if 'it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" *Id.* at 839 (citing *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985) (orig. proceeding)). Mandamus may be used to challenge a prior restraint on the media. *Star–Telegram, Inc. v. Walker*, 834 S.W.2d 54, 55 (Tex.1992).

### Prior Restraints

■■■ The Texas Constitution affirmatively grants the rights to freedom of speech and of the press: "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege...." TEX. CONST. art. I, § 8. In Texas, pre-speech sanctions or "prior restraints" are presumptively unconstitutional.[3] *Davenport v. Garcia*, 834 S.W.2d 4, 9 (Tex.1992). A prior restraint in a civil case "will withstand constitutional scrutiny only where there are specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm." *Id.* at 10.

In *Davenport*, the supreme court struck down the trial court's gag order prohibiting the parties, attorneys, and witnesses from discussing the case except as necessary with each other or in court. *Id.* at 6. The supreme court noted that, "a prior restraint will withstand scrutiny under this test only under the most extraordinary

---

**3.** *Davenport* emphasized the need to rely on the Texas Constitution in evaluating free speech and free press issues. *Id.* at 10. The Court stated, "Our rich history demonstrates a longstanding commitment in Texas to freedom of expression as well as a determination that state constitutional guarantees be given

full meaning to protect our citizens." *Id.* at 19. We therefore rely on independent and adequate state law, and any federal cases are cited only for guidance and do not compel the result reached under the Texas Constitution. *Id.* at 20; *see Star–Telegram, Inc. v. Walker*, 834 S.W.2d 54, 58 n. 6 (Tex.1992).

circumstances." *Id.* at 10. The supreme court explained that (1) the harm must be to the judicial process, (2) the harm must be imminent and severe, and (3) there must be no alternative available to address the threat to the judicial process that is less restrictive of state speech rights. *Id.* at 10–11. In addition, the supreme court observed that convenience will never justify the imposition of a gag order. *Id.* at 11 (citing *Ex parte McCormick,* 129 Tex. Crim. 457, 462, 88 S.W.2d 104, 107 (1935)).

### The Right to Gather News

■ The First Amendment provides, "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. CONST. amend. I. Similarly, article I, section 8, provides that "no law shall ever be passed curtailing the liberty of speech or of the press." TEX. CONST. art. I, § 8. The parties have not argued that the right to gather news under the Texas constitution is broader than that afforded by the United States constitution. In fact, at oral argument they directed our attention to federal precedent. In light of the nearly identical language in the two charters, we find that the right to gather news under the Texas constitution is coextensive with that right under the United States constitution. *See Operation Rescue–Nat'l v. Planned Parenthood of Houston and Se. Tex., Inc.,* 975 S.W.2d 546, 559 (Tex.1998) ("It is possible that Article I, Section 8 may be more protective of speech in some instances than the First Amendment, but if it is, it must be because of the text, history, and purpose of the provision, not just simply *because.*").

As a Texas appellate court construing the constitutionality of a Texas district court order restricting the rights of Texas citizens, we apply Texas law, *i.e., Davenport.* However, we also look to well-reasoned and persuasive federal authority to inform our analysis of the relator's right to gather news. *Davenport,* 834 S.W.2d at 20 ("With a strongly independent state judiciary, Texas should borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is deemed helpful, but should never feel compelled to parrot the federal judiciary.")

■ News organizations may receive, investigate, and report on public trial proceedings, but they generally have no right to information not available to the public generally. *In re Express–News Corp.,* 695 F.2d 807, 809 (5th Cir.1982). In *Express–News,* the Fifth Circuit held a local federal district court rule prohibiting any person from interviewing any juror concerning the deliberations or verdict of the jury, except by leave of court, to be unconstitutional as applied to the interviews sought. *Id.* at 808. In particular, the court of appeals held that the rule violated the newspaper's constitutional right to gather news. *Id.* The court of appeals noted the relationship between freedom of the press and the right to gather news:

> The first amendment's broad shield for freedom of speech and of the press is not limited to the right to talk and to print. The value of these rights would be circumscribed were those who wish to disseminate information denied access to it, for freedom to speak is of little value if there is nothing to say. Therefore, the Supreme Court recognized in *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626, 639 (1972), that news-gathering is entitled to first amendment protection, for "without some protection for seeking out the news, freedom of the press could be eviscerated."

*Id.* at 808–11. The court also noted the relationship between the right to gather news and the public's right to receive the news:

Government-imposed secrecy denies the free flow of information and ideas not only to the press but also to the public. The public right to receive information has been repeatedly recognized and applied to a vast variety of information. The judiciary, like the legislative and judicial branches, is an agency of democratic government. The public has no less a right under the first amendment to receive information about the operation of the nation's courts than it has to know how other governmental agencies work and to receive other ideas and information.

*Id.* at 809 (footnote omitted). Finally, the court of appeals observed that the right to gather news is not absolute, and may sometimes be outweighed by competing interests, like a criminal defendant's Sixth Amendment right to a fair trial, or a discharged juror's right to privacy and protection against harassment. *Id.* at 809–10. But even in these instances, a court rule cannot restrict the journalistic right to gather news unless it is narrowly tailored to prevent a substantial threat to the administration of justice. *Id.* at 810. In addition, the court of appeals stated that discharged jurors are under no obligation to speak. *Id.* at 811 ("The jurors' freedom of speech is also freedom not to speak, and the district court may so instruct the jurors in order to avoid the possible misunderstanding that jury service places them under some obligation to subject themselves to scrutiny or to submit to interview.").

### Restrictions on Discharged Jurors' Speech

Restrictions on juror speech have rarely been found to be constitutionally permissible; the restrictions have been limited to situations, such as protecting the secrecy of juror deliberations, protecting the privacy of jurors, and preserving a defendant's sixth amendment right to a fair trial in criminal cases. *See U.S. v. Cleveland,* 128 F.3d 267, 267–71 (5th Cir.1997) (upholding restriction on juror interviews to protect secrecy of jury deliberations); *U.S. v. Harrelson,* 713 F.2d 1114, 1116–18 (5th Cir.1983) (same); *Haeberle v. Tex. Int'l Airlines,* 739 F.2d 1019, 1020–22 (5th Cir. 1984) (upholding restriction on juror interviews to protect juror privacy when interviews sought by litigant's attorney); *U.S. v. Williams,* No. H–03–0221–11, 2006 WL 3099631 at *4 (S.D.Tex. October 30, 2006) (slip copy) (upholding restriction on juror interviews to protect secrecy of jury deliberations); *State v. Neulander,* 173 N.J. 193, 801 A.2d 255, 271–75 (2002) (upholding restriction on juror interviews after mistrial in capital murder case to prevent the State from gaining unfair advantage on retrial).

■ We conclude that the right to gather news generally includes the right of the press to interview willing, discharged jurors, except when outweighed by a compelling government interest, such as the need to protect the sanctity of jury deliberations, a juror's right to privacy and to be free from harassment, or a defendant's Sixth Amendment right to a fair trial. *Cleveland,* 128 F.3d at 267–71; *Haeberle,* 739 F.2d at 1020–22; *Harrelson,* 713 F.2d at 1116–18; *In re Express–News Corp.,* 695 F.2d at 808–11; *Neulander,* 801 A.2d at 271–75.

### Difficulty Empaneling a Jury

■ The trial court restricted the discharged jurors' right to speak to "the press, media, or *others,*" because it concluded that the additional, incremental publicity would cause imminent and irreparable harm to the judicial process by making it even more difficult to empanel a jury. But no findings or evidence show that the additional, incremental publicity from juror interviews would cause immi-

nent and irreparable harm to the judicial process. *Davenport*, 834 S.W.2d at 10. To satisfy the second prong of *Davenport*, the prior restraint must be the least restrictive means possible to prevent the threatened imminent and irreparable harm to the judicial process. *Id.* Other than voir dire, nothing in the record shows that the trial court considered other less restrictive means, such as continuance or change of venue. Further, the trial court's conclusion that voir dire would be inconvenient does not satisfy the *Davenport* standard. *Id.* at 11.

 Pretrial publicity does not necessarily create such harm to the judicial process as to outweigh the media's right to gather news. *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554–55, 96 S.Ct. 2791, 2800–01, 49 L.Ed.2d 683 (1976) ("[P]retrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial."); *see also Neulander*, 801 A.2d at 272 ("In our view, the inhibiting effect of media interviews of the first jury on the 'free exchange of ideas' by members of the retrial jury simply is too speculative a basis on which to justify restricting the media's right of access to consenting jurors. We also are inclined to doubt that such juror interviews would 'restrict the jury pool' on retrial."); *see also Ex parte McCormick*, 88 S.W.2d at 105–07.

The record does not show that interviews of the discharged jurors would preclude the selection of an impartial jury or that measures less restrictive than a gag order would be ineffective. *See Davenport*, 834 S.W.2d at 10. Other than the claimed difficulty in selecting a jury, there are no other claimed harms that may result from allowing the jurors to talk. The Sixth Amendment is inapplicable because

this is a civil case. U.S. CONST. amend. VI ("In all *criminal* prosecutions, the *accused* shall enjoy the right to a speedy and public trial, by an impartial jury. . . .") (Emphasis added).[4] The trial court was not concerned about the media harassing the jurors. There exists no concern about protecting the secrecy of juror deliberations because the trial ended before the conclusion of the plaintiffs' case, without any jury deliberations. We conclude that the gag order in this case is unconstitutional under article I, section 8 of the Texas Constitution.

### Conclusion

We conditionally grant the writ of mandamus and direct the trial court to vacate the September 18, 2007 and September 24, 2007 orders prohibiting the jurors from speaking to the press and others. We are confident the trial court will promptly comply and our writ will issue only if it does not.

---

4. The trial court found, "An imminent and irreparable harm to the judicial process could deprive present litigants of a just resolution of their dispute which must be balanced in light of movant's First Amendment concerns and the parties *Sixth Amendment* concerns." (Emphasis added).