801 A.2d 255

STATE OF NEW JERSEY, PLAINTIFF, v. FRED NEULANDER, DEFENDANT–RESPONDENT.

IN RE APPLICATION OF PHILADELPHIA NEWSPAPERS, INC., INTERVENOR–APPELLANT.

Argued March 25, 2002—Decided July 18, 2002.

194

*Warren W. Faulk* argued the cause for appellant (*Brown & Connery,* attorneys).

*Dennis Wixted* argued the cause for respondent (*Sufrin Zucker Steinberg Waller & Wixted,* attorneys).

*Thomas J. Cafferty* argued the cause for amici curiae, The New Jersey Press Association, The Newspaper Association of America, Advance Publications, Inc., The New York Times Company and Reporters Committee for Freedom of the Press (*McGimpsey & Cafferty,* attorneys; *Mr. Cafferty* and *Arlene M. Turinchak,* on the brief).

The opinion of the Court was delivered by

STEIN, J.

The issue in this appeal, one of first impression, concerns the power of a court, following a hung jury in a capital murder trial that will result in defendant's imminent retrial for capital murder, to prohibit representatives of the press from attempting to conduct interviews of the jurors after the trial court declared a mistrial.

This issue requires the Court to resolve the apparent tension between interests protected by the First Amendment and by the Sixth Amendment to the United States Constitution. As the United States Supreme Court has emphasized: "Commentary and reporting on the criminal justice system is at the core of First Amendment values, for the operation and integrity of the system is of crucial import to citizens concerned with the administration of government." *Nebraska Press Ass'n v. Stuart*, 427 *U.S.* 539, 587, 96 *S.Ct.* 2791, 2816, 49 *L.Ed.*2d 683, 714 (1976) (Brennan, J., concurring). Of comparable magnitude, the Sixth Amendment right "to a speedy and public trial, by an impartial jury," U.S. Const. amend. VI, has been characterized as "the most fundamental of all freedoms," *Estes v. Texas*, 381 *U.S.* 532, 540, 85 *S.Ct.* 1628, 1631, 14 *L.Ed.*2d 543, 549 (1965), and as "a right essential to the preservation and enjoyment of all other rights, providing a necessary means of safeguarding personal liberties against government oppression," *Nebraska Press, supra*, 427 *U.S.* at 586, 96 *S.Ct.* at 2815, 49 *L.Ed.*2d at 713.

We granted the motion of Intervenor Philadelphia Newspapers, Inc. for leave to appeal, *R.* 2:2–1(a), from an unpublished opinion of the Appellate Division that affirmed interlocutory orders entered by the trial court that prohibited; (1) identification of any juror in any publication and (2) all media representatives from contacting or attempting to interview any juror pending entry of a verdict. By order entered April 22, 2002, this Court, 5–2, vacated paragraph 13 of the Law Division's order of July 18, 2001 (prohibiting identification of jurors) "to the extent that it restrains the use of juror identification information that is part of the public

record of these proceedings," and also modified paragraph 15 of that order (prohibiting contact with or attempts to interview jurors) to "extend its application only until conclusion of [defendant's] retrial and the return of the verdict," and applying the prohibition imposed to communications between media and the jurors that are initiated by the jurors.

We now set forth at length the analytical basis for the Court's April 22, 2002 disposition.

## I

Defendant, Fred Neulander, a former rabbi of one of the largest synagogues in southern New Jersey, was indicted by a Camden County grand jury and charged in a three-count indictment with murder, felony murder, and conspiracy in connection with the November 1994 death of his wife Carol. The Camden County Prosecutor filed a notice of aggravating factors and is seeking the death penalty.

Defendant's prosecution and trial have been the subject of intense media ·attention and widespread coverage, especially in southern New Jersey and the greater Philadelphia area. With the permission of the trial court, Court TV televised the entire trial.

Jury selection for defendant's trial commenced August 20, 2001. In anticipation of the extensive media coverage of the trial, the trial court on July 10, 2000 sent a written invitation to various representatives of the print and broadcast media, and a wire service, to attend an informal conference with the court on July 18, 2001. (The invitation was widely disseminated, and included eighteen newspapers from New Jersey, Philadelphia, and New York, ten television news stations and five radio stations.) Following that informal conference the trial court issued on the same date its "Order Governing Media Coverage During Trial Proceedings," which imposed the two restrictions now at issue.

Paragraph 13 of the Order provides: "Neither the identity nor descriptions that would reasonably identify any juror may be

publicized, in any way, unless authorized by further order of this Court."

Paragraph 15 of the Order provides: "Media representatives shall not contact or attempt to interview any juror or potential juror."

On August 16, 2001, four days before jury selection commenced, Philadelphia Newspapers, Inc. (PNI) and The Associated Press (AP), moved before the trial court to delete paragraph 13, and amend or modify paragraph 15 of the July 18, 2001 Order. The trial court scheduled argument on the motion for August 31, 2001.

When jury selection commenced on August 20, 2001, each juror was asked to complete a fifty-page questionnaire, the content of which was not released either to the public or the media. During the first juror *voir dire* proceeding the following day, attended by several media representatives, the first four jurors were identified by name, placed under oath, and examined by counsel. Following that day's proceedings PNI filed an emergent motion seeking the court's consent to publication of "news reports that may identify or contain descriptions that may reasonably identify any jurors or potential jurors in this matter who were summoned or examined on August 20 and 21, 2001." The trial court also scheduled that motion for hearing on August 31, 2002. Prior to that hearing, the Appellate Division denied PNI's emergent application for leave to appeal the trial court's refusal to grant immediate relief.

On August 31, 2001, the trial court denied PNI's motion to vacate paragraph 13, but amended paragraph 15 of the July 18, 2001 Order to permit media representatives to request relaxation of the juror no-contact provision "subsequent to the entry of the verdict in this case." The Appellate Division denied PNI's motion for leave to appeal the trial court's disposition.

The trial began in mid-October and jury deliberations commenced November 2, 2001. On November 13, 2001 the trial court, having determined that the jurors were unable to reach a verdict, declared a mistrial and discharged the jury. PNI immediately

moved to vacate or relax paragraph 15 of the July 18, 2001 Order to permit interviews of the discharged jurors. The trial court refused to modify either paragraph 13 or 15, and ruled that they "remain in full force and effect, and the news media are prohibited from conducting interviews of any discharged jurors on this case and from publishing the identity or descriptions that would reasonably identify any discharged juror." The court explained:

> [T]here might be different considerations were this a jury that was completely discharged and no further proceedings would be held. Clearly that is not the case. I believe that Fred Neulander received a fair trial in this courtroom and he certainly has the right to a fair trial again.... [I]f there were to be a relaxation of either of these two provisions it has the capacity to undermine or weaken his right to a fair trial and specifically I find that jurors who are summoned for possible jury service, whether it be in this county or in another county, will know that they run the risk of having their names published and they run the risk of having their private deliberations in the jury room discussed, analyzed, broadcast, or in other ways disseminated and I think that those things do have the capacity to chill the free exchange of ideas in the jury room and will also have the capacity to restrict the jury pool that will be available for this case.

After PNI moved for leave to appeal the trial court's disposition, the court supplemented its oral opinion with a letter to the Appellate Division. The letter stated in part:

> At the time of the hearing, I was unaware that despite my Order to the contrary, news organizations had already followed jurors home, knocked on their doors and left letters in their mailboxes. Some jurors were contacted more than once by the same news organizations, either by repeated telephone calls or repeated visits to the jurors' homes. Some jurors reported that news vans or reporters in cars remained parked outside their homes or other locations waiting for them to emerge. One juror told me she requested stepped-up police patrols of her home.

> Other jurors have reported to me that news organization have repeatedly telephoned their employers. Such contacts have included repeated telephone calls to both the immediate supervisor and to the public information officer as well as the use of e-mail sent to the employers, all of which was in an attempt to contact the jurors.

> In addition, one television station broadcast footage of the jurors, including their faces, as they left the courthouse the day the mistrial was declared....

> Finally, on November 16, 2001, the Philadelphia Inquirer, a party to this appeal, published the name of the forelady on the jury, in violation of another portion of my July 18, 2001 Order.

> The above information is derived from telephone calls I received from six different jurors objecting to the efforts of the news organizations to contact and interview them. Some jurors called me more than once.

In an unpublished opinion, the Appellate Division .upheld the restrictions imposed by the trial court, noting that "[t]he record amply supports the judge's essential conclusion that interviews with discharged jurors and publication of their names would pose a clear and present danger to defendant's right to a fair trial." The court observed:

Although appellant asks us to consider separately the prohibitions against identifying jurors and interviewing them, we view the two as interrelated. It is unlikely that media accounts would name discharged jurors without further comment. The likelihood is that the deliberations of the discharged jurors would be discussed and published. The sanctity of the discharged jury's deliberations is critical to the judiciary's capacity to select a fair and impartial jury on retrial. Jury deliberations are not public. The singular vice of disclosure of prior deliberations is its capacity for destroying the ability of the jury on retrial to deliberate on the issue of guilt or innocence free of extraneous influence. This potential for harm inheres in the subtly coercive effect the media's account of prior deliberations would undoubtedly have on the ability of the jury on retrial to be fair.

We granted PNI's motion for leave to appeal.

## II

### A

■ The restriction on the publication of juror identifications implicates more clearly established First Amendment principles than does the prohibition of juror interviews. The obvious distinction is that the juror identities were disclosed in open court proceedings attended by media representatives. In comparison, jury deliberations, presumably the primary subject of the media's request to interview jurors, are a closed proceeding attended by no one but the deliberating jurors.

A leading case addressing the media's right to publish information lawfully obtained in the course of public court proceedings is *Cox Broadcasting Corp. v. Cohn*, 420 *U.S.* 469, 95 *S.Ct.* 1029, 43 *L.Ed.*2d 328 (1975). The issue in *Cox* was whether the State of Georgia constitutionally could recognize a father's cause of action for damages for invasion of privacy resulting from publication of the name of his daughter, a deceased rape victim, that was publicly revealed in connection with the prosecution of the crime.

The rape and murder of the victim occurred in August 1971 and six young men were indicted for the crimes. The victim's name was not publicly disclosed prior to trial, probably because of a Georgia statute making it a misdemeanor to publish or broadcast the name or identity of a rape victim. At a court appearance in April 1972, five of the defendants pleaded guilty to rape or attempted rape. On that occasion a reporter for Cox learned the victim's name by examining the indictments that were made available for his inspection in the courtroom. The victim's name then was disclosed in a news report broadcast later that day over the facilities of a television station owned by Cox.

The victim's father sued for damages, claiming that his right of privacy had been invaded by the broadcast. The trial court, relying on the Georgia statute, granted the father's motion for summary judgment on liability and rejected Cox's contention that its publication of the victim's name was protected by the First and Fourteenth Amendments. The Georgia Supreme Court initially held that the cause of action had its roots in the common law and was not based on the statute. It agreed that the constitutional arguments did not compel dismissal of the suit and remanded the matter for trial. On rehearing, that court expressly relied on the Georgia statute as a declaration of State policy that rape victims' identities are not of public concern, sustaining the constitutionality of the statute against a First Amendment challenge.

Reversing, the Supreme Court framed the issue as a "collision between claims of privacy and those of the free press," *id.* at 491, 95 *S.Ct.* at 1044, 43 *L.Ed.*2d at 347, and emphasized its prior recognition that accurate reports of open judicial proceedings enjoyed a special protected status:

'A trial is a public event. What transpires in the court room is public property. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt. And we can see no difference though the conduct of the attorneys, of the jury, or even of the judge himself, may have reflected on the court. Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it.'

[*Id.* at 492–93, 95 *S.Ct.* at 1045, 43 *L.Ed.2d* at 348 (quoting *Craig v. Harney*, 331 *U.S.* 367, 374, 67 *S.Ct.* 1249, 1254, 91 *L.Ed.* 1546 (1947)).]

Observing that "the interests in privacy fade when the information involved already appears on the public record," the Court, 8–1, concluded that the freedom of the press afforded by the First and Fourteenth Amendments precluded Georgia from making publication of the victim's name a basis for civil liability:

By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.

We are reluctant to embark on a course that would make public records generally available to the media but forbid their publication if offensive to the sensibilities of the supposed reasonable man. Such a rule would make it very difficult for the media to inform citizens about the public business and yet stay within the law. The rule would invite timidity and self-censorship and very likely lead to the suppression of many items that would otherwise be published and that should be made available to the public. At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records.

[*Id.* at 495–96, 95 *S.Ct.* at 1046–47, 43 *L.Ed.2d* at 349–50.]

Similarly, in *Nebraska Press, supra,* 427 *U.S.* 539, 96 *S.Ct.* 2791, 49 *L. Ed.2d* 683, decided one year after *Cox,* the Court reiterated its recognition that media reports of events that transpire in public courtroom proceedings enjoy First Amendment protection. There, a Nebraska state trial court, in anticipation of a trial for a multiple murder and related sexual assaults that had attracted widespread media coverage, granted the prosecutor's motion for a restrictive order prohibiting anyone that attended the court proceeding from " 'releas[ing] or authoriz[ing] the release for public dissemination in any form or manner whatsoever any testimony given or evidence adduced.' " *Id.* at 542, 96 *S.Ct.* at 2795, 49 *L.Ed.2d* at 688. That order was modified by the Nebraska

District Court to apply only until the jury was impaneled and to specify more precisely the subjects about which publicity was to be restricted. The Nebraska Supreme Court further modified the order to prohibit reporting of only three subjects: "(a) the existence and nature of any confessions or admissions made by the defendant to law enforcement officers, (b) any confessions or admissions made to any third parties, except members of the press, and (c) other facts 'strongly implicative' of the accused." *Id.* at 545, 96 *S.Ct.* at 2796, 49 *L.Ed.*2d at 689.

Although the orders at issue expired when the jury was impaneled, the United States Supreme Court ruled that the case was not moot because the underlying controversy was " 'capable of repetition.' " *Id.* at 547, 96 *S.Ct.* at 2797, 49 *L.Ed.*2d at 690. Reversing the judgment of the Nebraska Supreme Court, the Court noted the special protection afforded by the First Amendment against prior restraints on speech:

"Congress shall make no law ... abridging the freedom ... of the press," and it is "no longer open to doubt that the liberty of the press and of speech, is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action." ... The Court has interpreted these guarantees to afford special protection against orders that prohibit the publication or broadcast of particular information or commentary orders that impose a "previous" or "prior" restraint on speech. None of our decided cases on prior restraint involved restrictive orders entered to protect a defendant's right to a fair and impartial jury, but the opinions on prior restraint have a common thread relevant to this case.

. . . .

The thread running through all these cases is that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights.

. . . .

The damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events. Truthful reports of public judicial proceedings have been afforded special protection against subsequent punishment.... For the same reasons the protection against prior restraint should have particular force as applied to reporting of criminal proceedings, whether the crime in question is a single isolated act or a pattern of criminal conduct.

[*Id.* at 556–59, 96 *S.Ct.* at 2801–03, 49 *L.Ed.*2d at 695–98 (citations omitted).]

The Court also determined that the lower courts did not adequately consider or determine whether alternative measures less

drastic than the restrictions imposed on the media would have protected defendant's right to a fair trial:

> We have noted earlier that pretrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial. The decided cases "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." ... Appellate evaluations as to the impact of publicity take into account what other measures were used to mitigate the adverse effects of publicity. The more difficult prospective or predictive assessment that a trial judge must make also calls for a judgment as to whether other precautionary steps will suffice.
>
> We have therefore examined this record to determine the probable efficacy of the measures short of prior restraint on the press and speech. There is no finding that alternative measures would not have protected Simants' rights, and the Nebraska Supreme Court did no more than imply that such measures might not be adequate. Moreover, the record is lacking in evidence to support such a finding.
>
> [*Id.* at 565, 96 *S.Ct.* at 2805–06, 49 *L.Ed.*2d at 701 (citation omitted).]

Significantly, the Court noted that the Nebraska Supreme Court's modified order effectively prohibited the media, among other things, from reporting evidence that had been introduced at a preliminary hearing open to the public and the press, a restriction that the Court concluded was constitutionally infirm:

> To the extent that this order prohibited the reporting of evidence adduced at the open preliminary hearing, it plainly violated settled principles: "(T)here is nothing that proscribes the press from reporting events that transpire in the courtroom." *Sheppard v. Maxwell,* 384 *U.S.* at 362–363, 86 *S.Ct.* at 1522. See also *Cox Broadcasting Corp. v. Cohn,* 420 *U.S.* 469, 95 *S.Ct.* 1029, 43 *L.Ed.*2d 328 (1975); *Craig v. Harney,* 331 *U.S.* 367, 67 *S.Ct.* 1249, 91 *L.Ed.* 1546 (1947). The County Court could not know that closure of the preliminary hearing was an alternative open to it until the Nebraska Supreme Court so construed state law; but once a public hearing had been held, what transpired there could not be subject to prior restraint.
>
> [*Id.* at 568, 96 *S.Ct.* at 2807, 49 *L.Ed.*2d at 703.]

Primarily because the lower courts had failed to consider the adequacy of less restrictive alternatives, the Court reversed the judgment below. *Id.* at 570, 96 *S.Ct.* at 2808, 49 *L.Ed.*2d at 704.

Similarly, in *Oklahoma Publishing Co. v. District Court,* 430 *U.S.* 308, 97 *S.Ct.* 1045, 51 *L.Ed.*2d 355 (1977), at issue was the validity of a pretrial order entered in a Juvenile Court proceeding that enjoined members of the news media from "publishing,

broadcasting, or disseminating in any manner, the name or picture of a minor child" in connection with a juvenile proceeding concerning that child then pending before the court. Before the contested order was entered, the court had conducted a detention hearing at which the juvenile appeared, and newspaper reporters, including one from petitioner's newspapers, had been in attendance and learned the juvenile's name. One of petitioner's photographers had photographed the juvenile during his removal from the courtroom. Subsequently, a number of news stories appeared in local papers, including three newspapers owned by petitioner that included the juvenile's name and photograph. Petitioner challenged the pretrial order restraining publication as violative of the First and Fourteenth Amendments. The Oklahoma Supreme Court upheld the order, relying on a state statute mandating that juvenile proceedings are to be private unless otherwise ordered by the court and that juvenile records are open to inspection " 'only by order of the court to persons having a legitimate interest therein.'" *Id.* at 309–10, 97 *S.Ct.* at 1046, 51 *L.Ed.*2d at 357 (quoting Okla. Stat. Ann. Tit. 10, §§ 1111, 1125 (West Supp.1976)).

Relying on *Cox* and *Nebraska Press*, the Supreme Court reversed, observing that the order prohibiting publication was invalid because the juvenile's name and photograph lawfully had been obtained in the course of open court proceedings:

> We think Cox and Nebraska Press are controlling nonetheless. Whether or not the trial judge expressly made such an order, members of the press were in fact present at the hearing with the full knowledge of the presiding judge, the prosecutor, and the defense counsel. No objection was made to the presence of the press in the courtroom or to the photographing of the juvenile as he left the courthouse. There is no evidence that petitioner acquired the information unlawfully or even without the State's implicit approval. The name and picture of the juvenile here were 'publicly revealed in connection with the prosecution of the crime,' much as the name of the rape victim in Cox Broadcasting was placed in the public domain. Under these circumstances, the District Court's order abridges the freedom of the press in violation of the First and Fourteenth Amendments. [430 *U.S.* at 311–12, 97 *S.Ct.* at 1047, 51 *L.Ed.*2d at 358–59 (citation omitted) (footnote omitted).]

The Supreme Court also has accorded constitutional protection to factually accurate information published or reported by

the media and lawfully obtained, although not from open court proceedings. *See, e.g., Bartnicki v. Vopper,* 532 *U.S.* 514, 533–35, 121 *S.Ct.* 1753, 1764–65, 149 *L.Ed.*2d 787, 805–06 (2001) (holding that application of wiretap acts' prohibitions against intentional disclosure of illegally intercepted communication, that disclosing party knows or should know was illegally obtained, to media defendants who were uninvolved in illegal interception violated defendants' free speech right because tape concerned matters of significant public importance); *The Florida Star v. B.J.F.,* 491 *U.S.* 524, 526, 109 *S.Ct.* 2603, 2605, 105 *L.Ed.*2d 443, 450–51 (1989) (holding that First Amendment precludes Florida from permitting rape victim, whose name inadvertently was disclosed by newspaper that lawfully obtained victim's name from County Sheriff's Department, from recovering damages against newspaper notwithstanding Florida statute making it unlawful to " 'print, publish, or broadcast ... in any instrument of mass communication' " name of victim of sexual offense)(quoting Fla. Stat. Ann. § 794.03 (1987)); *Smith v. Daily Mail Publ'g Co.,* 443 *U.S.* 97, 104–06, 99 *S.Ct.* 2667, 2671–72, 61 *L.Ed.*2d 399, 405–07 (1979) (holding that West Virginia statute that prohibited newspapers from publishing, without consent of juvenile court, name of any youth charged as juvenile offender violated First and Fourteenth Amendments as applied to newspapers that truthfully published alleged delinquent's name that was lawfully obtained by monitoring police band radio frequency and interviewing eyewitnesses).

## B

The question whether a court, to protect a defendant's Sixth Amendment rights on retrial, can prohibit interviews of members of a hung jury that could not reach a verdict in the guilt phase of a capital murder prosecution appears to be an issue of first impression. Research discloses that the narrow issue before us was adverted to in *dicta* by the Second Circuit Court of Appeals in *United States v. Moten,* 582 *F.*2d 654 (1978), where the court reversed the District Court's denial of a convicted defen-

dant's request to conduct post-verdict interviews of jurors in a case in which a juror had been discharged for apparent misconduct. In commenting on the authority of the trial court to bar all juror interviews the Second Circuit observed:

> When there has been a showing warranting an investigation, barring all interviewing, even under supervision of the court, is improper. We note that even in *Miller* further inquiry was not foreclosed. *In some cases, a complete bar may be appropriate. An example given in Professor Moore's Treatise is "a publicized case which ends in a hung jury and is likely to be retried."* In such a case, "the trial judge should instruct jurors not to disclose the deliberation, lest it jeopardize the fairness of the second trial." 8A Moore's Federal Practice—Criminal Rules ¶ 31.08[1][b], at 31–58 n. 13 (2d ed.1977).
>
> [*Id.* at 666 (citation omitted) (emphasis added).]

The reported decisions in federal and state courts concerning the right of media representatives to conduct post-verdict juror interviews do not include criminal cases in which, as in the matter before us, a hung jury will require an imminent retrial. The general rule that we distill from the cases is that post-verdict juror interviews generally are permitted if the juror consents, but jurors are not required to consent. Moreover, courts often require that media representatives refrain from making repeated requests for interviews, and that jurors not be questioned about the votes or opinions of other jurors.

Among the more restrictive recent opinions is *United States v. Brown,* 250 *F.*3d 907 (5th Cir.2001), involving an appeal by news media from orders of the District Court in the second criminal trial of former Louisiana Governor Edwin Edwards. Because of allegations of attempted bribery and witness tampering the court granted the Government's motion for an anonymous jury, and also prohibited the media from attempting to "circumvent" the jurors' anonymity. The court also barred the media from portions of the jury *voir dire.* After the verdict acquitting Governor Edwards of all charges, the court informed the jurors that it would not disclose their identities without their consent. Jurors consenting to disclosure of their identifies were instructed that they could refuse to permit any interviews, that they could discuss with the media their general reactions to the trial, but that they could not

be interviewed about jury deliberations without a court order. No jurors waived the right to anonymity. Shortly after the verdict the court unsealed the transcript of the closed *voir dire*.

On appeal, the Fifth Circuit held that the District Court's order barring the media from "circumventing" its juror anonymity order was an unconstitutional prior restraint to the extent that it "interdicted the press from independent investigation and reporting about the jury based on facts obtained from sources other than confidential court records, court personnel or trial participants." *Id.* at 917–18. The court, however, upheld the trial courts post-verdict refusal to disclose juror names and addresses without their consent, noting that the court did not prohibit media interviews with consenting jurors, and also observing that in the unique circumstances of the underlying trial the rationale for protecting the jurors' identities continued to be relevant after the verdict. The court stated:

> The district court's order denying the request for juror identifying information and questionnaires in this case is analogous to the order upheld in *Cleveland*. The order is sufficiently narrow. It has no requirement for a showing of good cause for conducting post-verdict interviews. It merely states that the court will not release juror information without the juror's consent. The judge affirmatively asked the jurors whether they wished to relinquish their privacy. Any juror may, at any time, voluntarily decide to relinquish his confidentiality. The only restriction placed on such interviews is the court's instruction that jurors may not be interviewed concerning juror deliberations absent a special order from the judge. This is consistent with our understanding that "[c]ompelling governmental interest[s] in the integrity of jury deliberation require that the privacy of such deliberations and communications dealing with time be preserved."
>
> According to this circuit's established caselaw, protecting jurors from post-verdict harassment and invasions of privacy is a legitimate concern. The measures used by the district court, while at the outer limit of permissible restrictions, were narrowly tailored to prevent real threats to the administration of justice, not just in this case but in the subsequent related prosecutions. If jurors voluntarily waive their anonymity and consent to interviews on matters other than jury deliberations, so be it. They need not become unwilling pawns in the frenzied media battle over these cases.
>
> [*Id.* at 921 (citations omitted) (footnote omitted).]

Similarly, in *United States v. Cleveland*, 128 *F*.3d 267 (1997), the Fifth Circuit upheld the validity of a trial court order, following a highly publicized criminal trial of six defendants, including two

former Louisiana state senators, on racketeering charges, that prohibited post-verdict media interviews of jurors *concerning jury deliberations* without court approval. Two newspaper publishers and two reporters challenged the order, contending that it compromised their First Amendment right to gather news because the restrictions on interviews about juror deliberations was impermissibly vague. Upholding the trial court's order, the Fifth Circuit concluded that the restriction on interviews concerning deliberations was sufficiently clear and did not restrict the media from questioning jurors about their general reactions to the trial. The court observed:

> The order entered by Judge Vance does not foreclose "questions about a juror's general reactions," as did the order in *Express–News*. The newspapers have argued that the use of the term "deliberations" is imprecise and might be construed by jurors wishing to speak as extending to their individual reactions to the trial proceedings occurring in open court. We disagree. The restriction of post-verdict interviews concerning "jury deliberation" was expressly endorsed by this Court in Harrelson. As contemplated by *Harrelson* and as used in Judge Vance's order, "deliberations" refers only to the discussions about the case occurring among jurors within the sanctity of the jury room. A juror in this case may be interviewed about his own "general reactions" to the trial proceedings, and he is only prevented from being interviewed about the private debates and discussions which took place in the jury room during the time leading up to the jury's rendering of its verdict.
>
> . . . .
>
> The term "deliberations of the jury" may not be a paragon of definiteness and precise meaning. Few terms in our language are. The term does, however, bring an immediate image to mind: the members of a jury in the jury room discussing and debating the evidence, the testimony, and the instructions from the court in order to reach a verdict. We hold that the term "jury deliberations" is sufficiently definite to convey the idea the district court intended and does not realistically threaten First Amendment protected communication. That is all that the law requires.
>
> [*Id.* at 270–71 (citations omitted).]

In *United States v. Antar*, 38 *F*.3d 1348 (3d Cir.1994), at issue were orders of the trial court in a highly publicized criminal fraud trial sealing for five months the transcript of the jury *voir dire* from which members of the press had been excluded because the courtroom was overcrowded, and imposing restrictions on post-verdict juror interviews by the media. Media representatives challenged the validity of the sealing order and of the interview

restrictions that essentially stated: (a) no juror may be compelled to grant an interview; (b) repeated requests that a juror grant an interview are prohibited; (c) if a juror expresses a desire to terminate an interview in progress, the interviewer must terminate questioning immediately; (d) during the interview of a juror, no question may be asked about the votes, statements, opinions or comments of any other juror during jury deliberations. Although the District Court unsealed the *voir dire* transcripts approximately five months after the verdict, the Third Circuit held that the trial court's order sealing the *voir dire* transcripts for five months violated the media's First Amendment right of access to voir dire proceedings. The court noted:

> Pursuant to *Press–Enterprise I*, then, there exists a presumptive right of access to voir dire proceedings. This right of access may not be abridged absent the satisfaction of substantive and procedural protections. On the substantive side, a court ordering closure must first establish that the competing interest asserted is not only "compelling," but also that it outweighs the First Amendment right of access. Second, it must determine that the limitations imposed are both necessary to and effective in protecting that interest. One part of establishing the necessity of a limitation is a consideration of alternative measures and a showing that the limitation adopted is the least restrictive means of accomplishing the goal. On the procedural side, these determinations must be covered by specific, individualized findings articulated on the record *before* closure is effected.
>
> [*Id.* at 1359 (citation omitted).]

Because the trial court made no findings to justify the order sealing the *voir dire* transcripts, and failed to consider whether less restrictive alternatives would have been adequate, the Third Circuit invalidated the order sealing the transcripts. The court also invalidated two of the court-imposed restrictions on post-verdict juror interviews because of the absence of any finding that those restrictions were necessary. The court stated:

> As noted above, there is substantial debate about the value of post-verdict interviews. *Supra* note 8. The benefits of access and of public awareness of the duties and obligations of the jury process are weighed against concerns that courts may become carnivals, that jurors may be reluctant to serve in future cases if they fear their comments in the jury room will be repeated later by their fellow jurors for broadcast to the public, and that public knowledge of the factors behind a verdict may undermine respect for the process.
>
> . . . .

Turning to the specific restrictions imposed here, we will affirm the first, that no juror is obliged, or may be compelled, to grant an interview. This restriction is consistent with the advice long given to jurors concerning post-trial press contacts. We conclude, however, that the second and third prohibitions, against "repeated" juror contacts and against any attempt to resume a juror interview after a juror expresses a desire to conclude it, cannot stand in the absence of any finding by the court that harassing or intrusive interviews are occurring or are intended. The existing or threatened basis for such restrictions must be present before they are imposed. Furthermore, even if sufficient basis for imposing these restrictions did exist, it is not certain that, in the absence of the consideration of alternatives, they would have been the least restrictive means available to the court.

[*Id.* at 1363–64.]

The Third Circuit also upheld the restriction on questions about the opinions of other deliberating jurors, although expressing concern about the lack of justification for that restriction. *Id.* at 1364.

Similar restrictions on post-verdict juror interviews were upheld in *United States v. Doherty,* 675 *F.Supp.* 719 (D.Mass.1987). That case involved a seventeen-week criminal racketeering trial during which the jury was sequestered and juror names and addresses were not disclosed during the trial. After the verdict the jurors unanimously expressed their preference not to disclose their names and addresses to the press. Two newspapers intervened to compel identification of the jurors. The District Court determined, based on First Amendment considerations, that post-verdict identification of jurors was required, but delayed disclosure of juror names and addresses for seven days to afford "to each juror a short breathing space to reflect on the experience of jury service and, after consultation with family and friends, determine what, if anything, the juror wishes to discuss with the press." *Id.* at 725. The court also ordered that any juror had the right to refuse to grant an interview request, and prohibited any further inquiry of any juror expressing a desire not to be interviewed. *Id.* at 726.

The media's right to conduct post-verdict juror interviews also was recognized by the Tenth Circuit Court of Appeals in *Journal Publishing Company v. Honorable E.L. Mechem,* 801 *F.*2d 1233 (1986). Following a civil trial in which the plaintiff prevailed on a

claim that the police chief and other police officers of the City of Albuquerque had violated his civil rights, the trial court issued an order prohibiting jurors from discussing the case with media representatives. A local newspaper sought review of the order. The Tenth Circuit, although acknowledging the trial court's authority to impose reasonable restrictions on post-verdict juror interviews, concluded that the trial court's order was overbroad and impermissibly infringed on the media's First Amendment rights:

> Judge Mechem's order restricting press contact with former jurors was impermissibly overbroad. It contained no time or scope limitations and encompassed every possible juror interview situation. It would have been constitutionally permissible for the court routinely to instruct jurors that they may refuse interviews and seek the aid of the court if interviewers persist after they express a reluctance to speak. It could have told the jurors not to discuss the specific votes and opinions of noninterviewed jurors in order to encourage free deliberation in the jury room. But the court could not issue a sweeping restraint forbidding all contact between the press and former jurors without a compelling reason.
>
> [*Id.* at 1236–37 (citations omitted).]

Similarly, in *United States v. Harrelson*, 713 *F.*2d 1114 (1983), the Fifth Circuit upheld a trial court's order as imposing reasonable restrictions on post-verdict juror interviews following a criminal trial convicting several defendants of charges arising out of the murder of a Federal judge. The challenged restrictions stated:

> 1. No juror has any obligation to speak to any person about this case, and may refuse all interviews or comment.
>
> 2. No person may make repeated requests for interviews or questioning after a juror has expressed his or her desire not to be interviewed.
>
> 3. No interviewer may inquire into the specific vote of any juror other than the juror being interviewed.
>
> 4. No interview may take place until each juror in this case has received a copy of this order, mailed simultaneously with the entry of this order.
>
> [*Id.* at 1116.]

The Court of Appeals upheld the ban on repeated requests for interviews as one designed merely to "forbid nagging." *Id.* at 1118. In sustaining the restriction against inquiries about the votes of other jurors, the Court observed:

> We must now determine the validity of the above "rule narrowly tailored to prevent the disclosure of the ballots of individual jurors," a matter on which we

expressly declined comment in *Express–News,* 695 *F.*2d, at 811. Our ruling requires little more than a specific application of the general principles announced in *United States v. Gurney,* 558 *F.*2d 1202 (5th Cir.1977).

There we held generally that members of the press, in common with all others, are free to report whatever takes place in open court but enjoy no special, First Amendment right of access to matters not available to the public at large. The particulars of jury deliberation fall in the latter class, and the court's narrow restriction was well within its discretion. As the Supreme Court observed, in the course of assuming the existence of a common-law privilege against forced disclosure of such matters:

Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world (quoting *Clark v. United States,* 289 *U.S.* 1, 13, 53 *S.Ct.* 465, 468, 77 *L.Ed.* 993 (1933) (Cardozo, J.)).

[*Id.* at 1118.]

*See also In re Globe Newspaper Co.,* 920 *F.*2d 88, 91, 98 (1st Cir.1990) (invalidating trial court's refusal following high profile criminal trial to provide newspaper publisher with juror names and addresses, and noting that although Court "shares [the] view that it is unfortunate when a juror divulges the jury's deliberations" and that "[n]othing compels or encourages a juror to be interviewed," jurors identity cannot be withheld post verdict absent special circumstances justifying nondisclosure); *In re Express–News Corporation,* 695 *F.*2d 807 (5th Cir.1982) (invalidating as overbroad District Court rule prohibiting post-verdict interviews of any juror concerning jury deliberations or verdict in any proceeding without leave of court); *United States v. Sherman,* 581 *F.*2d 1358, 1361–62 (9th Cir.1978) (reversing trial court order following guilty verdict in high profile criminal trial prohibiting jurors from discussing case and barring news media from contacting jurors, but holding that although interviews were permissible jurors had no obligation to respond to interviews and should report to court persistent attempts to interrogate them); *United States v. Franklin,* 546 *F.Supp.* 1133, 1144 (N.D.Ind.1982) (ordering that post-verdict juror interviews following high profile civil rights trial are permitted only if jurors consent and noting that court "can discourage jurors from communicating about the contents of juror deliberations without ordering them to refrain from doing so"); *In re Disclosure of Juror Names and Addresses,* 233

*Mich.App.* 604, 592 *N.W.*2d 798, 809 (Mich.Ct.App.1999) (holding that in high profile serial rape and murder trial press has qualified right of post-verdict access to jurors names and addresses subject to trial court's right to fashion order that considers such interests as juror safety).

Scholarly commentary on the subject of post-verdict juror interviews is sparse. One recent article surveyed post-verdict interviews of jurors that were reported by news media during the preceding fifteen years. Nancy S. Marder, *Deliberations and Disclosures: A study of Post–Verdict Interviews of Jurors,* 82 *Iowa L.Rev.* 465 (1997) (Deliberations and Disclosures). The author notes that the most frequently expressed comments by jurors that participated in post-verdict interviews focused on the evidence that influenced the jury's verdict.

> Among the 221 instances in which jurors offered some explanation or observation about the decision the jury reached or the dynamics that characterized its deliberations, *the largest percentage (32%) of comments pertained to the evidentiary basis for the jury's decision.* Typically, jurors pointed to the evidence that they had found persuasive: white-out on a bill in the tax case against Leona Helmsley; the credibility of the victim in the rape charges brought against Mike Tyson; the credibility of witnesses in the Bensonhurst case, in which Joseph Fama was convicted of the murder of Yusuf Hawkins; the implausible testimony of Jean Harris, who was convicted of murdering her lover; the lack of credibility of John Bobbitt in the unlawful wounding charge brought against his wife Lorena Bobbitt; the unreliability of the testimony of the prosecution's star witness in the conspiracy and assault charges brought against John Gotti and in the murder charges brought in Howard Beach; the sheer accumulation of evidence in the World Trade Center bombing; inconsistencies in the State's evidence in the rape trial of William Kennedy Smith; and evidence, rather than emotion, in the trial of O.J. Simpson.
>
> [*Id.* at 479–80 (emphasis added).]

Professor Marder also observes that post-verdict interviews can undermine the indivisibility of the jury's function:

> Post-verdict interviews of jurors undercut the unitary aspect of the jury. This aspect is important given the power that is accorded a jury verdict and its significance as a judgment of the community. On a practical level, it is the jury verdict, and not the views of individual jurors, that has power; on a symbolic level, it is the jury verdict, and not the views of individual jurors, that represents the judgment of the community. The jury acquires its power and meaning as a group, and post-verdict interviews threaten that group aspect. Such interviews treat the jury as if it is nothing more than a gathering of individuals involved in the exchange of ideas. Although this is certainly part of what the jury does, it does

much more; the jury is not simply the sum of its parts. Post-verdict interviews, by focusing on individuals' comments or points of view, overlook the group nature of the jury's task.

[*Id.* at 473.]

She recommends that courts should provide guidance to jurors concerning post-verdict interviews that emphasizes the importance of confidentiality and that prohibits the disclosure of the votes or comments of the other jurors. *Id.* at 546.

Another commentator advocates the imposition of significant restrictions on post-verdict juror interviews, conditioning their occurrence on specific authorization by the trial court. Abraham S. Goldstein, *Jury Secrecy and the Media: The Problem of Postverdict Interviews,* 1993 *U. Ill. L.Rev.* 295, 312. Professor Goldstein expresses the view that post-verdict interviews impose on juries a level of accountability that conflicts with their role as the community's conscience:

The media seek interviews in the most sensational cases, in which public attention is highest. Jurors called to serve in such cases will expect to be interviewed and will expect their fellow jurors to be interviewed. Inevitably, that expectation will affect how freely they talk to each other; it will make them feel visible to the world and accountable as individuals, not as a body. The previously anonymous jurors, reaching a group decision based on "community values" and lay perspectives, will feel they must justify it in the court of public opinion.
.... Unchecked, the interviewing of jurors in high visibility cases will expose to view "the difficult and uniquely human judgments that defy codification and that 'build discretion, equity and flexibility into a legal system.'" That, in turn, surely will unravel the distinctive nonrational and intuitive "genius" of this lay tribunal.

[*Id.* at 314.]

*See also* Robert Lloyd Raskopf, *A First Amendment Right of Access to a Juror's Identity: Toward a Fuller Understanding of the Jury's Deliberative Process,* 17 *Pepp. L.Rev.* 357, 378 (1990) (advocating qualified post-verdict media right of access to jurors names and addresses to be balanced in each case against interests disfavoring such access).

### III

### A

As noted, paragraph 13 of the trial court's July 18, 2001 Order provides: "Neither the identity nor descriptions that would rea-

sonably identify any juror may be publicized, in any way, unless authorized by further Order of this Court." In our April 22, 2002 Order disposition we unanimously determined to vacate paragraph 13 "to the extent that it restrains the use of juror identification information that is part of the public record of these proceedings."

Plaintiff's brief indicates that on August 21, 2002, "the first four prospective jurors were individually examined in an open *voir dire* proceeding attended by members of the media" and that "[e]ach juror was identified by name when placed under oath and referred to by name when examined by counsel." Although the record is silent, we infer that the *voir dire* of the remaining jurors similarly was conducted in open court proceedings. We also take note of statutory provisions that contemplate public posting in the County Clerk's office of the names selected from the juror source list to be summoned for services as petit jurors. See *N.J.S.A.* 2B:20–4 and –5.

 Unlike other cases in which juror identities were anonymous during trial in order to insulate jurors from corrupting influences or to protect them from harassment and intimidation, see *U.S. v. Brown, supra,* 250 *F.3d* at 910–11, the names of the jurors at issue here publicly were identified throughout the *voir dire* proceeding. The record does not reflect that either the parties or the trial court expressed concern about the public identification of jurors that freely occurred during the jury selection process. In that context, we reaffirm our prior holding vacating paragraph 13 of the July 18, 2001 Order "to the extent that it restrains the use of juror identification information that is part of the public record of these proceedings." We reiterate the Supreme Court's cogent rationale for protecting the freedom of the media to report truthful information derived from open court proceedings:

> Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public

business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.

[*Cox Broadcasting Corp., supra*, 420 *U.S.* at 495, 95 *S.Ct.* at 1046, 43 *L.Ed.*2d at 350.]

## B

In explaining the rationale underlying both the restriction on juror identification and the restriction on post-verdict interviews the trial court expressed concern about defendant's right to a fair retrial, focusing on the possible adverse effects on the retrial jury. Specifically, the court expressed concern that the retrial jurors' knowledge that members of the original jury were interviewed by the media would "have the capacity to chill the free exchange of ideas in the jury room and will also have the capacity to restrict the jury pool that will be available for this case."

■ We decline to rest our continuing restriction of post-verdict interviews of members of the hung jury on those specific concerns. In our view, the inhibiting effect of media interviews of the first jury on "the free exchange of ideas" by members of the retrial jury simply is too speculative a basis on which to justify restricting the media's right of access to consenting jurors. We also are inclined to doubt that such juror interviews would "restrict the jury pool" on retrial. We noted in *State v. Biegenwald*, 106 *N.J.* 13, 35–36, 524 *A.*2d 130 (1987), "that persuasive pretrial publicity does not necessarily preclude the likelihood of an impartial jury," and that "the appropriate inquiry is whether the jury selection process actually resulted in a fair and impartial jury." In this matter, both the passage of time and the trial court's determination to change the venue for retrial suggest that the task of empaneling an impartial jury will not be insurmountable.

Our apprehension about the propriety of media interviews of members of the hung jury derives from this Court's extensive and unique experience since the 1982 reinstatement of the death penalty in reviewing in excess of fifty direct appeals from murder

convictions in which the death penalty has been imposed, in addition to several appeals from denial of post-conviction relief in capital cases as well as numerous proportionality review proceedings. That experience, coupled with the recognition "that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice," *Gregg v. Georgia*, 428 *U.S.* 153, 188, 96 *S.Ct.* 2909, 2932, 49 *L.Ed.*2d 859, 883 (1976), counsels that the Court be extremely cautious concerning juror interviews when a death penalty retrial is pending.

Our most specific concern is that jurors submitting to media interviews might reveal some insight into the jury's deliberative process that would afford the prosecution a significant advantage at the retrial and thereby provide defendant with a colorable Sixth Amendment issue for appeal in the event of a conviction. We previously have noted the survey statistics revealing that when jurors consent to media interviews "the largest percentage (32%) of comments pertained to the evidentiary basis for the jury's decision." *Deliberations and Disclosures, supra,* 82 *Iowa L.Rev.* at 479. We reasonably can infer that if post-verdict interviews of members of the hung jury had been permitted, reports of those interviews would have been likely to reveal the reactions of individual jurors to the evidence presented, and might also have included observations by jurors about specific strengths and weaknesses in the State's case. Whether such reports significantly would have affected the retrial strategies of the prosecution and defense is unknown. In our view, however, the risk that such disclosures could provide the prosecution with an undue advantage in the retrial proceeding is sufficiently substantial to persuade us that the safer course is to disallow the interviews despite the attendant limitation on the media's First Amendment interests.

We previously have acknowledged that the first trial was televised and was the subject of widespread publicity. PNI asserts that the prohibition on interviews is unlikely to be effective because the news media can publish information about juror deliberations obtained from a third party who spoke with a juror.

Nevertheless, we perceive that the potential for affording the prosecution an inappropriate advantage in a retrial could be increased if media interviews of members of the hung jury revealed heretofore undisclosed details about evidentiary facts that were pivotal to the jury's deliberations.

Although we find little precedent on the precise issue, we note that concerns analogous to those that support our holding were implicated in the Appellate Division's decision to bar the penalty phase of a death penalty trial in *State v. Baker*, 310 *N.J.Super.* 128, 708 *A.*2d 429 (1998). In that capital case, the defendant was found guilty by a jury of murder, felony murder, and other crimes. Although no physical evidence linked the defendant to the crime, the State's case relied on the testimony of two alleged accomplices, Scott Barnes and Eric Lewis, who entered into plea agreements and testified that defendant had inflicted the fatal wounds. After a six-week trial, the jury returned its guilty verdict on July 8, 1997, but was not discharged because of the pending penalty phase.

On July 10, 1997, a local newspaper reported the substance of the jury's guilt-phase deliberations in an article that began as follows:

> It was all there in black and white after a jury convicted Scott Baker of murdering Beatrice Baskin.
>
> The jurors made a list, with two columns on it. They left it in the jury room.
>
> They wrote down many reasons for convicting Baker, 25, of stabbing the 75-year-old Brick Township woman to death while robbing her.
>
> High on the list was testimony of Scott Barnes, 25, formerly of Manchester Township, who said he drove Baker to Baskin's house so he could rob her the night she was killed.
>
> And they wrote down two reasons for acquitting him: Eric Lewis, the ineffective state's witness, and the lack of physical evidence linking Baker to the killing.

[310 *N.J.Super.* at 131, 708 *A.*2d 429.]

The trial court conducted an inquiry to ascertain how the newspaper had obtained access to jury material described as " 'records prepared by the jury, lists setting forth the manner in which its deliberations had proceeded and the manner in which they arrived at the conclusion that they arrived at.' " *Ibid.* The

court determined that while the court clerk was in the jury room after the verdict to collect the exhibits for counsel, the County Prosecutor observed the jury material in question and disclosed the contents to a reporter. Subsequently, the trial court granted defendant's motion to preclude the death penalty on grounds of double jeopardy and fundamental fairness, concluding that defendant would be prejudiced by proceeding to a penalty phase with a new jury. The trial court stated:

> This is a death penalty case and calls for enhanced scrutiny and vigilance considering that the State, as representative of the people, is seeking not to imprison the defendant, but to humanely extinguish his life. The admonition of Justice Story, in the early double jeopardy decision of the U.S. Supreme Court, *United States v. Perez*, [9 *Wheat.* 579], 22 *U.S.* 579 [6 *L.Ed.* 165] (1824) at page 580, bears due consideration: "in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner."
>
> [*Id.* at 134, 708 *A.*2d 429.]

The Appellate Division affirmed, concluding that the Prosecutor's breach of the confidentiality of the jury's guilt phase deliberations mandated dismissal of the penalty phase proceeding:

> We are in full accord with Judge Turnbach's conclusion, for the reasons stated by him, that defendant, in these circumstances, will be substantially and irremediably prejudiced by proceeding on the penalty phase with a new jury. We are in full accord with the judge's conclusion that irrespective of any evil intent, the Prosecutor's conduct that placed defendant in his present predicament constituted an egregious, intentional and intolerable breach of the inviolability of the secrecy of jury deliberations. And we are in full accord with the judge's conclusion that the doctrine of fundamental fairness demands the remedy of preclusion. There is no effective alternative measure or lesser sanction available here. We appreciate that there is a countervailing interest of the public that criminal prosecutions not be thwarted and that wrongdoers be brought to account. We are satisfied, however, that that interest has been fully satisfied here by the unaffected return of the first-degree murder verdicts.
>
> [*Id.* at 139, 708 *A.*2d 429.]

 Although the analogy between *Baker* and the issue before us is imperfect, the connecting thread is that jury deliberations are conducted in secrecy to preserve the integrity of the jury process. *State v. LaFera*, 42 *N.J.* 97, 106–07, 199 *A.*2d 630 (1964). Our court rules prohibit attorneys and parties from interviewing or questioning jurors about "any matter relating to the case" except by court order for good cause shown. *Rule* 1:16–1. Although we acknowledge that in ordinary circumstances the confi-

dentiality of jury deliberations does not override the media's First Amendment interest in conducting post-verdict interviews of a consenting juror about that juror's reaction to the case, the media interest is not absolute. In special circumstances it may be required to yield to a compelling state interest, provided that any restrictions imposed are narrowly tailored to serve that interest. See *Globe Newspaper Company v. Superior Court*, 457 *U.S.* 596, 606–07, 102 *S.Ct.* 2613, 2620, 73 *L.Ed.*2d 248, 256–58 (1982).

The restriction on post-verdict interviews of the hung jury imposed by our April 22, 2002 Order expires on conclusion of the retrial and return of a verdict, and properly addresses the unique concern presented by this record that media interviews of jurors not encroach on defendant's Sixth Amendment right to a fair trial. The unwelcome limitation that we impose on the media in this matter does not diminish in the slightest the high value that this Court traditionally has accorded to the media's right to have access to and report on criminal proceedings, under both the federal and state constitutions. *State v. Williams*, 93 *N.J.* 39, 58–59, 459 *A.*2d 641 (1983). Nevertheless, our pragmatic understanding of and long experience in death penalty appellate litigation impel us to intervene in order to avoid Sixth Amendment issues that inevitably would be raised if we stayed our hand.

We note but reject our dissenting colleagues' concern, post at 226–27, 801 *A.*2d 277, that our expansion of the trial court's restraint to include juror-initiated interviews implicated PNI's due process interests. The grant of PNI's motion for leave to appeal was accompanied by the filing of supplemental briefs and extended oral argument. In the contest of the oral argument, the terms and conditions of this Court's April 22, 2002 Order were well within the range of possible disposition that the parties could have anticipated.

## IV

For the reasons stated, we modify and affirm the July 18, 2001 order of the Law Division in accordance with this Court's Order of April 22, 2002.

LONG, J., concurring in part and dissenting in part.

I am in full agreement with the majority's conclusion that any restraint on the truthful dissemination of jurors' names, previously made public in pretrial proceedings, is unconstitutional. I also join in my colleagues' rejection of the lower courts' stated reasons for restraining post-verdict interviews of jurors initiated by the media. The passage of time, the already-ordered change of venue and a searching *voir dire* will ensure an adequate jury pool and the empanelling of impartial jurors capable of the free exchange of ideas. That is what the Sixth Amendment requires. *U.S. Const.* amend. VI.

I part company from the Court in connection with its extraordinary and unprecedented expansion of the prior restraint imposed by the lower courts on juror interviews. That order was entered without notice, without any basis in fact and without an effort at circumscription, thus constituting an intolerable infringement on First Amendment freedoms.

## I

Restrictions on speech "may be lawfully imposed, if at all, only when narrowly tailored" to achieve a compelling state interest. *Florida Star v. B.J.F.*, 491 *U.S.* 524, 541, 109 *S.Ct.* 2603, 2613, 105 *L.Ed.*2d 445, 460 (1989). Like speech, newsgathering is entitled to First Amendment protection. *Branzburg v. Hayes*, 408 *U.S.* 665, 681, 92 *S.Ct.* 2646, 2656, 33 *L.Ed.*2d 626, 639 (1972); *Griswold v. Connecticut*, 381 *U.S.* 479, 482, 85 *S.Ct.* 1678, 1680, 14 *L.Ed.*2d 510, 513 (1965) ("The right of freedom of speech and press includes not only the right to utter or to print, but ... the right to receive ... and freedom of inquiry[.]") (citations omitted); *In re Express–News Corp.*, 695 *F.*2d 807, 808–9 (5th Cir.1982) ("[F]reedom to speak is of little value if there is nothing to say."). The question whether a prior restraint on those First Amendment rights is narrowly tailored to protect a compelling interest requires a "determin[ation] whether, as Learned Hand put it, 'the gravity of the 'evil,' discounted by its improbability, justifies such invasion of

free speech as is necessary to avoid the danger.'" *Nebraska Press Ass'n v. Stuart,* 427 *U.S.* 539, 562, 96 *S.Ct.* 2791, 2804, 49 *L.Ed.*2d 683, 699 (1976) (quoting *United States v. Dennis,* 183 *F.*2d 201, 212 (2d Cir.1950), *aff'd,* 341 *U.S.* 494, 71 *S.Ct.* 857, 95 *L.Ed.* 1137 (1951)); *Express–News Corp., supra,* 695 *F.*2d at 810 ("A court rule cannot[ ] . . . restrict the journalistic right to gather news unless it is *narrowly tailored* to prevent a substantial threat to the administration of justice.") (emphasis added). A court reviewing "one of the most extraordinary remedies known to our jurisprudence" must consider, among other factors, "how effectively a restraining order would operate to prevent the threatened danger" and whether other measures short of restraint would mitigate the effects of unrestricted speech. *Nebraska Press Ass'n, supra,* 427 *U.S.* at 562, 96 *S.Ct.* at 2804, 49 *L.Ed.*2d at 699. In other words, the order must be *necessary* and it must be *effective* at achieving the government's goals.

In adjudicating whether a restraint on First Amendment freedoms meets those standards, all affected parties must be given proper notice and an opportunity to be heard, and the ordering court must cite to *specific evidence* explaining the necessity of its restrictions. *Id.* at 565, 96 *S.Ct.* at 2806, 49 *L.Ed.*2d at 701 (finding nothing in record, other than judicial speculation, supporting determination that no less restrictive alternatives would protect fair trial rights); *United States v. Antar,* 38 *F.*3d 1348, 1351 (3d Cir.1994) ("In order to restrict the right of access, . . . a court must carefully articulate specific and tangible, rather than vague and indeterminate, threats to the values which the court finds override the right of access."); *State ex rel. Beacon Journal Pub. Co. v. Kainrad,* 46 *Ohio St.*2d 349, 348 *N.E.*2d 695, 697 (Ohio 1976) ("Before issuing any such order not to publish, it is obligatory upon the court to hold a hearing and make a finding that all other measures within the power of the court to insure a fair trial have been found unavailing and deficient.").

The fundamental First Amendment rights of free speech and the press demand the due process protections of the Fourteenth

Amendment. *Duncan v. Louisiana,* 391 *U.S.* 145, 148, 88 *S.Ct.* 1444, 1446–47, 20 *L.Ed.*2d 491, 495 (1968) (citing *Fiske v. Kansas,* 274 *U.S.* 380, 47 *S.Ct.* 655, 71 *L.Ed.* 1108 (1927)). In *Davis v. Scherer,* 468 *U.S.* 183, 201, 104 *S.Ct.* 3012, 3022–23, 82 *L.Ed.*2d 139, 154 (1984), the Supreme Court explained:

> While "(m)any controversies have raged about ... the Due Process Clause," ... it is fundamental that except in emergency situations (*and this is not one*) due process requires that when a State seeks to terminate (a protected) interest ..., it must afford "notice and opportunity for hearing appropriate to the nature of the case" *before the termination becomes effective.*
>
> [*Ibid.* (emphasis added) (quoting *Board of Regents v. Roth,* 408 *U.S.* 564, 570 n. 7, 92 *S.Ct.* 2701, 2705 n. 7, 33 *L.Ed.*2d 548, 556 (1972) (quoting *Bell v. Burson,* 402 *U.S.* 535, 542, 91 *S.Ct.* 1586, 1591, 29 *L.Ed.*2d 90 (1971))).]

Those are the principles that should inform our analysis.

## II

There are two separate orders at issue in this case. The first is the trial court order (affirmed by the Appellate Division) that restrained publication of jurors' names and prohibited post-verdict interviews of jurors initiated by the media. The second is this Court's order of April 22, 2002, reversing the interdiction against publication of jurors' names and expanding the restraints to include a prohibition on juror-initiated contact with the media.

Each order individually violates the procedural due process principles to which I have adverted. The trial court did not give notice, hold a hearing or take evidence before issuing its restrictive orders. In fact, early in the proceedings the court apparently promised jurors that their names would never be published. Even after the media challenged the court's orders, no evidence was adduced to support any factual findings that could justify the restrictions. Post-restriction argument is inadequate in these circumstances, in the absence of an emergency, because it has the improper effect of placing the burden on the opponent of the already-imposed restriction to show why it should be lifted when it is the proponent who should have borne the laboring oar from the beginning.

Moreover, this Court's order has generated a due process problem of its own. Throughout these proceedings and even during oral argument before this Court, all parties expressed an understanding that the sole post-verdict interview issue was whether the restraint on *media-initiated* contact with jurors was justified. It was conceded by all parties, at all stages, that the trial court's order did not prohibit juror-initiated expressions or interviews. Yet that is exactly what the majority interdicted in the expanded order it entered on April 22, 2002. In other words, without argument and without notice that it intended to expand the trial court's restraints, the Court acted to impair the jurors' free speech rights and consequently to limit the media's access to that information.

It goes without saying that if—*at the request of a litigant*—a court could not constitutionally grant relief that would "terminate, impair or modify a substantial right or claim of another" without providing that party with notice and an opportunity to be heard, *England v. Doyle,* 281 *F.*2d 304, 306 (9th Cir.1960) (citing *Chaloner v. Sherman,* 242 *U.S.* 455, 37 *S.Ct.* 136, 61 *L.Ed.* 427 (1917)), that neither could it do so *sua sponte.* In short, the extraordinary expansion of the trial court order to prohibit juror-initiated publicity, without notice or an opportunity to be heard on that specific issue, separate and apart from its substantive deficiency (see *infra* Point III), violated the procedural due process guarantees of the United States Constitution as well as our own. *U.S. Const.* amends. V, XIV; *N.J. Const.* art. 1, para. 1.

## III

### A

Obviously, if there is no true danger to any compelling interest, there is no need for a preventative measure. In such circumstances any limitation on a First Amendment right would fail. The majority has proposed as a compelling interest that media publication of the discharged jurors' perceptions about the trial

will afford the prosecution an "undue advantage" in preparation for retrial, thus setting the stage for defendant to advance a "colorable" Sixth Amendment claim on appeal. *Ante* at 219, 801 A.2d 271–72.

That notion is nothing more than judicial speculation that is not only unsupported by the record but controverted by it. Intense media attention surrounded every aspect of this case. Gavel-to-gavel television coverage of the trial occurred along with legal and political disquisition on every word that the jurors heard out of the mouths of the witnesses, the attorneys and the court. Third-party commentary about the weaknesses and strengths of the parties' cases could be seen and heard daily on almost any area network newscast and even through postings on Internet websites. Courier–Post Online, *Fred Neulander on Trial,* at http://www.southjerseynews.com/neulander; Courtroom Television Network LLC, *The Rabbi and the Hitmen,* at http://www.courttv.com/trials/neulander/index.html. Newspaper coverage was at a saturation point.

Simply stated, no aspect of this case has escaped public discourse. Thus, it is extremely unlikely that any comments made by former jurors would give even a crumb of new insight to a moderately competent prosecutorial team. In fact, it is so improbable that neither defense counsel nor the lower courts even alluded to it obliquely as support for a prior restraint. In sum, the record not only is devoid of anything to support the concerns on which the majority today rests its unprecedented decision; it, in fact, belies that decision.

### B

Even assuming, however, that media interviews with jurors could be viewed as somehow problematic from a trial strategy point of view, that would not, in any event, be an invitation to a broad and unrestricted prior restraint on speech and the press. For any restraint to pass muster it would nevertheless have to satisfy the twin standards of necessity and effectiveness. *Nebraska Press Ass'n, supra,* 427 *U.S.* at 562, 96 *S.Ct.* at 2804, 49

*L.Ed.*2d at 699. In other words, it would have to be limned narrowly to impose the least restriction necessary to ameliorate the perceived evil. Implicit in such tailoring are the notions of underinclusivity and overbreadth, both of which are offended by the majority's order here.

Underinclusivity inheres in orders restraining the media:

When a State attempts the extraordinary measure of punishing truthful publication ..., it must demonstrate its commitment to advancing [the competing] interest by applying its prohibition evenhandedly, to the smalltime disseminator as well as the media giant. Where important First Amendment interests are at stake, the *mass scope of disclosure is not a surrogate for injury. A ban on disclosures effected by "instrument[s] of mass communications" simply cannot be defended on the ground that partial prohibitions may effect partial relief.*

[*Florida Star, supra,* 491 *U.S.* at 540, 109 *S.Ct.* at 2613, 105 *L.Ed.*2d at 460 (emphasis added) (citations omitted).]

The order as modified and affirmed is underinclusive because it does not prevent jurors from discussing with friends, co-workers, relatives or even total strangers their reactions to the trial, and it certainly does not bar those third parties from relaying such information to the media. Neither does it prevent jurors from posting their thoughts on an Internet newsgroup or website or writing an essay or book about their experiences. *See Nancy S. Marder, Deliberations and Disclosures: A Study of Past–Verdict Interviews of Jurors,* 82 *Iowa L.Rev.* 465, 474 n. 21 (noting that in past thirty years, jurors have written over twelve books about their jury service). Indeed, if one of the jurors *is* a member of the media and chooses to write an editorial about his or her own jury service, such activity is beyond the scope of the order. In effect, the order is a partial prohibition directed solely at the media that provides ineffective relief and thus suffers from under-inclusivity.

At the other end of the spectrum is the problem of overbreadth, which occurs when the government restricts more speech than is necessary to achieve a permissible result. The danger created by overbroad restraints is that "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by [an order] susceptible of application to protected expression," *Gooding v. Wilson,* 405 *U.S.*

518, 521, 92 *S.Ct.* 1103, 1105, 31 *L.Ed.*2d 408, 413 (1972), i.e., where the "continued existence of the [order] in unnarrowed form would tend to suppress constitutionally protected rights." *Coates v. City of Cincinnati*, 402 *U.S.* 611, 620, 91 *S.Ct.* 1686, 1691, 29 *L.Ed.*2d 214, 221 (1971) (White, J., dissenting) (citation omitted); *Cantwell v. Connecticut*, 310 *U.S.* 296, 304, 60 *S.Ct.* 900, 903, 84 *L. Ed.* 1213, 1218 (1940) ("In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom."). In sum, a restraint on speech

> must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."
>
> [*Gooding, supra*, 405 *U.S.* at 522, 92 *S.Ct.* at 1106, 31 *L.Ed.*2d at 414 (quoting *NAACP v. Button*, 371 *U.S.* 415, 433, 83 *S.Ct.* 328, 338, 9 *L.Ed.*2d 405, 418 (1963)).]

The total ban on all contact between jurors and the media on all subjects renders the Court's order overbroad, prohibiting even those communications that could not possibly be relevant to trial strategy. The order effectively precludes inquiry into jurors' perceptions about general, public matters such as the judicial system and jury selection process. It prevents the jurors from speaking about the impact of jury duty on their day-to-day personal and professional lives. It even sanctions investigative reporting about issues of public importance. For example, after the mistrial, four PNI reporters published an article revealing a serious issue over whether the foreperson was actually a New Jersey resident. Joseph A Gambardello et al., *Rabbi Juror: "We All Saw it a Totally Different Way," Philadelphia Inquirer*, Nov. 16, 2001, at A1. Each of those four reporters has since been held in contempt and sentenced for publishing the foreperson's name, and three of them for attempts to contact her and other jurors—actions that could not affect "trial strategy" in any possible way.

The combination of underinclusiveness and overbreadth presented here is a common one in orders that fail to pass constitutional muster and should have the same effect in this case. That is not to suggest that there could never be a limit imposed on

post-verdict media-juror contact. Other courts have recognized that carefully limited restrictions based on the particular facts and circumstances presented might be permissible. *United States v. Antar*, 38 *F*.3d 1348, 1363–64 (3d Cir.1994) (holding that prohibition against repeated interview requests fails "in the absence of findings that jurors were being harassed or that a threat of harassment was impending" and that restrictions against inquiry into juror votes should be supported by trial court's explanation for necessity of such restriction); *Journal Publ'g Co. v. Mechem*, 801 *F*.2d 1233, 1236–37 (10th Cir.1986) (citation omitted) (overturning "sweeping restraint forbidding all contact between the press and former jurors without a compelling reason" but recognizing that trial court may inform jurors of right to refuse interview and instruct them "not to discuss the specific votes and opinions of noninterviewed jurors in order to encourage free deliberation in the jury room").

What is clear, however, is that the kind of ineffective yet overbroad restriction imposed by the trial court and expanded by the majority based on invalid animating principles cannot stand if the First Amendment is to be accorded any meaning whatsoever.

## IV

One final point. The majority purports to base its decision to continue and expand the restrictions on the media's First Amendment rights on the protection of defendant's Sixth Amendment rights. However, it expressly rejects (correctly, I believe) the notion that the restraints are necessary to ensure an impartial and freely deliberative jury on retrial, the hook to the Sixth Amendment. The majority instead yokes its argument to *State v. Baker*, 310 *N.J.Super.* 128, 708 *A*.2d 429 (1998), a capital case involving prosecutorial misconduct in which jurors' notes and charts from their guilt-phase deliberations were discovered by the State and then reported publicly through a newspaper reporter. *Id.* at 131 & n. 1, 708 *A*.2d 429. In precluding the State from further pursuing the death penalty with the empanelment of a new jury,

the court carefully noted that it was the unique circumstances of the case—specific, articulable factors of prejudice directly caused by the State's misdeed—that made it a clear candidate for application of the fundamental fairness principle. *Id.* at 138–39, 708 *A.*2d 429. Moreover, the State's misconduct was the very reason that the defendant facing death was put in the additionally precarious position of losing his experienced trial counsel, who could no longer continue his *pro bono* representation; losing his original, carefully selected jury; and facing new jurors who would hear a "sanitized" version of the State's case without the benefit of exposure to vigorous cross-examination and the nuances of live witnesses' testimony. *Id.* at 134–35, 708 *A.*2d 429. The Appellate Division determined that "in the context of the magnitude of the prosecutorial misconduct here," *id.* at 136, 708 *A.*2d 429, and the "substantial[ ] and irremediabl[e] prejudice[ ]" the defendant would suffer in a penalty phase with a new jury, fundamental fairness demanded that the State be barred from further pursuing the death penalty. *Id.* at 139, 708 *A.*2d 429.

The *Baker* court did not fault, in the slightest, the media's actions: "I want to make it clear that the reporter's actions were not wrong which occurred here. Indeed, they were the vehicle by which the [prosecutor's] wrong came to light...." *Id.* at 133, 708 *A.*2d 429. *Baker's* unique circumstances demanded invocation of the fundamental fairness principle against the State because of State misconduct amounting to "an egregious, intentional and intolerable" invasion into the secrecy of juror deliberations, which in fact unduly prejudiced defendant. *Id.* at 139, 708 *A.*2d 429. No constitutional fair trial rights were at stake, nor were the media's First Amendment freedoms.

In this case, on the other hand, it is the *media* that seeks to exercise its First Amendment right to access discharged jurors either on their initiative or on its own. No party presently before us has been accused of prejudicial misconduct involving an empaneled jury. Indeed, the sole and tenuous connection that the majority finds to *Baker* is the importance of secrecy to protect the sanctity of the jury process, *ante* at 221, 801 *A.*2d 274, a notion it

outright *rejected* at an earlier portion of its opinion. *Ante* at 218, 801 *A.*2d 270.

The retrial will be an entirely new and distinct event, with both parties beginning on equal footing, with equal access to all information reported by the media. As noted above, the majority's fears that even lawful and fair media reporting about the deliberations of discharged jurors might give the State some added benefit is so remote a possibility as to be illusory. Broad restrictions against media access simply are not necessary. The new jurors, in a new venue, after searching *voir dire* will hear the case anew with their own ability to observe witnesses first-hand.

## V

The outright ban on contact with discharged jurors is an unconstitutional prior restraint entered without regard to procedural due process of law. The minimal incremental potential impact of a former juror's statements on the State's retrial case, if any, is trivial in light of the extensive publicity about every other aspect of the case, from the killing of Carol Neulander and her husband's arrest and indictment through the gavel-to-gavel coverage of the first trial and beyond. Interviews with discharged jurors do not present "the kind of threat to fair trial rights that ... possess the requisite degree of certainty to justify restraint." *Nebraska Press Ass'n, supra,* 427 *U.S.* at 569–70, 96 *S.Ct.* at 2808, 49 *L.Ed.*2d at 704. Even if media interviews with jurors presented a realistic threat to defendant in the form of an unfair State advantage on retrial, the order affirmed and expanded by the majority is unconstitutionally underinclusive and overbroad. Therefore, I dissent.

Chief Justice PORITZ joins in this opinion.

*For affirmance as modified*—Justices STEIN, COLEMAN, VERNIERO, LaVECCHIA, and ZAZZALI—5.

*Concurring in part; dissenting in part*—Chief Justice PORITZ, and Justice LONG—2.